**William MORRIS, Plaintiff,**

v.

**PROGRESSIVE CASUALTY INSURANCE COMPANY, INC., Defendant.**

**No. 86 Civ. 9605 (CLB).**

United States District Court, S.D. New York.

June 22, 1987.

---

Raymond J. Keegan, White Plains, N.Y., for plaintiff.

David W. Brand, Garden City, N.Y., for defendant.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge:

For the second time within a year, we are called upon to construe §§ 3420(f)(1) and (f)(2) of the New York Insurance Law. For the reasons set forth below, we hold that the cross-motions for summary judgment now before us present claims appropriate for declaratory judgment, and grant plaintiff's motion for summary judgment.

The plaintiff, William Morris, contracted with defendant for a policy of insurance on his motorcycle. The original policy, apparently issued on July 15, 1985, provided coverage for bodily liability, guest passenger liability, and for what the declarations page calls "uninsured motorists" (hereinafter "UM") coverage, each in the amount of $10,000 per person and $20,000 per accident (hereinafter "$10,000/$20,000"). Defendant's Memorandum of Law, Exh. A. On April 7, 1986, the policy was amended, at the request of Morris, increasing these coverages to $100,000 per person and $300,000 per accident (hereinafter "$100,000/$300,000"). The revised declarations page continued to refer to UM coverage. *Id.* Exh. B.

On June 18, 1986, Morris was involved in an accident with a vehicle operated by one Michael Jacobson. Jacobson carried only the minimum $10,000 coverage for bodily injury required by N.Y.Veh. & Traf.L.

§ 311(4)(a) (McKinney 1986). Morris initiated suit against Jacobson in Supreme Court, Putnam County: the Prudential Insurance Company, Jacobson's carrier, offered the full face amount of $10,000 in settlement. Defendant's policy contained a provision disclaiming UM coverage if the covered person "settles the bodily injury claim without our consent." Because he did not wish to forfeit his UM coverage by settling with Jacobson, Morris interposed a claim against defendant under the UM provision of the policy. Defendant rejected the claim on the ground that Jacobson was not an "uninsured" motorist in the sense of the policy endorsement, but merely underinsured.

Defendant's position is that it offers only UM coverage within the meaning of N.Y. Ins.L. § 3420(f)(1) (McKinney 1985), which requires that every motor vehicle liability insurance policy contain a so-called uninsured motorists endorsement ("the UME"), providing $10,000/$20,000 in coverage for bodily injury occasioned by an accident with an uninsured motorist. When Morris voluntarily chose to supplement his UM coverage, defendant contends, he simply purchased more § (f)(1) coverage: he chose to protect himself, to a greater extent than § (f)(1) requires, against uninsured and other motorists enumerated in N.Y.Ins.L. § 5202 and in § (f)(1) (and in defendant's policy, which reflects but does not duplicate these provisions). Because Jacobson carried the minimum $10,000 in liability coverage, defendant maintains, he was not uninsured in the sense of § (f)(1); in consequence, Morris was not covered as to this accident.

Morris argues that the additional coverage he purchased, even though it is denominated UM coverage, is not the statutorily required UME of § (f)(1), but the "supplementary uninsured motorists insurance" (hereinafter "SUMI"), sometimes called "underinsurance," which all vehicle owners and operators in New York have the option to purchase under § 3420(f)(2). Such insurance allows an insured vehicle owner or operator to make up the difference between the amount of coverage he wants to carry and the lesser amount carried by somebody, here Jacobson, who is responsible for an accident in which the insured is injured.

Section 3420(f)(2), as we held in *Downey v. Allstate Insurance Co.*, 638 F.Supp. 322, 324 (S.D.N.Y.1986), requires insurers to provide SUMI "at the insured's election." Defendant claims that Morris did not ask for SUMI and therefore did not get it. It denies that it even offers SUMI (or underinsurance) on *motorcycle* policies in New York, arguing that Morris is simply confusing the quite different concepts of UM coverage and SUMI.

Morris argues that his increased coverage must have been SUMI, by operation of law: what defendant *calls* UM coverage is in actuality SUMI, and defendant cannot avoid its obligation to provide coverage simply by omitting the term "SUMI" or "underinsurance" from its endorsement.

In consequence of defendant's refusal to acknowledge coverage, Morris seeks a declaration from this Court that his policy indeed provides SUMI, that he be allowed to settle with Jacobson, and that he then be allowed to pursue his claim against defendant for the $100,000 coverage he enjoys under SUMI.

### Propriety of Declaratory Judgment

Defendant has not objected to the propriety of a declaratory judgment proceeding in this case. Disputes over coverage afforded by an insurance policy present an actual case or controversy, so that declaratory judgment is appropriate. *See, e.g., Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Whether to entertain a declaratory judgment proceeding is always within the district court's discretion, and the Supreme Court has reminded us that "a federal district court should, in the exercise of discretion, decline to exercise diversity jurisdiction over a declaratory judgment action raising issues of state law when those same issues are being presented contemporaneously to state courts." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 126, 88 S.Ct. 733, 746, 19 L.Ed.2d 936 (1968). However, that is not

the case here. There is no state negligence action in which the issue concerning which a declaration is sought would be presented. In the action that underlies this case, Prudential has already offered the full amount of Jacobson's coverage in settlement of the claim against him. What Morris seeks from this Court is a declaration as to whether he can accept that settlement without prejudice to his rights under his own policy. There is no *pending* state proceeding in which the coverage issue can be resolved. Morris could have sought a declaratory judgment in the New York Supreme Court, *see* N.Y.C.P.L.R. § 3001, but chose to come to this Court instead. In view of the fact that the existence of an alternative remedy (including a declaratory judgment in an alternative forum) does not preclude the entry of a declaratory judgment, *see* Fed.R.Civ.P. 57, we decline to overrule that choice. Accordingly, we consider the merits.

*Scope and Purpose of § 3420(f)(1)*

Section 3420(f)(1) provides:

No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any natural person arising out of the ownership, maintenance and use of a motor vehicle by the insured shall be issued or delivered by any authorized insurer upon any motor vehicle then principally garaged or principally used in this state unless it contains a provision whereby the insurer agrees that it will pay to the insured, as defined in such provision, subject to the terms and conditions set forth therein to be prescribed by the board of directors of the Motor Vehicle Accident Indemnification Corporation and approved by the superintendent, all sums, not exceeding a maximum amount or limit of ten thousand dollars exclusive of interest and costs, on account of injury to and all sums, not exceeding a maximum amount or limit of fifty thousand dollars exclusive of interest and costs, on account of death of one person, in any one accident, and the maximum amount or limit, subject to such limit for any one person so injured of twenty thousand dollars or so killed of one hundred thousand dollars, exclusive of interest and costs, on account of injury to, or death of, more than one person in any one accident, which the insured or his legal representative shall be entitled to recover as damages from an owner or operator of an uninsured motor vehicle, unidentified motor vehicle which leaves the scene of an accident, a motor vehicle registered in this state as to which at the time of the accident there was not in effect a policy of liability insurance, a stolen vehicle, a motor vehicle operated without permission of the owner, an insured motor vehicle where the insurer disclaims liability or denies coverage or an unregistered vehicle because of bodily injury, sickness, or disease, including death resulting therefrom, sustained by the insured, caused by accident occurring in this state, and arising out of the ownership, maintenance or use of such motor vehicle.

This section must be read together with the Motor Vehicle Accident Indemnification Corporation Act, N.Y.Ins.L. §§ 5201–5225 (McKinney 1985). In particular, the MVAIC Act's statement of purpose, § 5201(b), controls § 3420(f)(1) as well as that Act. *Application of MVAIC,* 32 Misc.2d 1055, 229 N.Y.S.2d 788, 790, *rev'd on other grounds sub nom. MVAIC v. Levy,* 17 A.D.2d 965, 234 N.Y.S.2d 152 (2d Dep't 1962). Section 5201(b) records a legislative finding that the financial responsibility provisions of the Vehicle and Traffic Law failed to compensate victims of motor vehicle accidents involving the seven kinds of vehicles enumerated in § 3420(f)(1)—uninsured vehicles in general, hit-and-run vehicles, registered vehicles without liability insurance, stolen vehicles or vehicles operated without the owner's permission, vehicles for which the insurer disclaims liability, and unregistered vehicles. The legislature intended the MVAIC to fill these gaps. Indeed, as originally enacted, § 3420(f)(1) required the *MVAIC* to compensate the injured party within the statutory limits: only in 1965 was the statute amended to provide that the insurer pay. *See State-*

*Wide Insurance Co. v. Curry*, 43 N.Y.2d 298, 302, 372 N.E.2d 31, 401 N.Y.S.2d 196, 198 (1977).

■ Thus, for purposes of § (f)(1), "uninsured motor vehicle," one of the seven categories of vehicle provided for by § (f)(1), is a term of art, to be understood by reference to the MVAIC Act's definition. Section 5202(d) defines an uninsured motor vehicle as one that is not insured, and § 5202(c) defines an insured motor vehicle as one for which proof of financial security under the Vehicle and Traffic Law is maintained. In short, a motor vehicle is uninsured if it carries less than the $10,000 in bodily injury insurance required by Veh. & Traf.L. § 311(4)(a). *Neals v. Allstate Insurance Co.*, 34 A.D.2d 265, 311 N.Y.S.2d 315 (1970) (finding vehicle uninsured for § (f)(1) purposes even though it was insured for North Carolina statutory limit of $5,000).

Because Michael Jacobson carried the minimum $10,000 required by the Vehicle and Traffic Law, he was not an uninsured motorist for purposes of § 3420(f)(1). Morris does not contend that Jacobson falls into one of the other six categories of vehicles against which the legislature intended to protect innocent victims when it enacted the MVAIC Act and § (f)(1). Thus, defendant is correct in its contention that *if* its policy was issued pursuant to § (f)(1) it does not provide coverage. We cannot agree, however, that the policy was issued pursuant to § (f)(1).

■ We begin by noting that § (f)(1) requires, in unambiguous and explicit terms, that every motor vehicle liability policy contain a clause whereby the insurer contracts to pay a *maximum* of $10,000/$20,000 to the insured involved in an accident with any of the seven enumerated kinds of motor vehicles. *See, e.g., Nationwide Mutual Insurance Co. v. Miller*, 111 A.D.2d 438, 488 N.Y.S.2d 497, 498 (3d Dep't 1985) ("Insurance Law § 3420(f)(1) limits the recovery of an insured under the uninsured motorist endorsement to $10,000 per person and $20,000 per occurrence.") The fact that the statute *requires* such a clause does not, of itself, show that it *prohibits* a consumer from contracting for more than $10,000 per bodily injury in accidents with the seven enumerated kinds of vehicles. By the same token, it is not a statutory *authorization* for the issuance of uninsured motorist coverage in such amounts, and there is reason to suppose that the New York courts would not interpret it as such an authorization. For the New York courts have consistently resisted attempts by consumers to stack two or more uninsured motorist endorsements, implying that they take the $10,000/$20,000 maximum to establish an absolute ceiling on recovery under § (f)(1) for bodily injury caused by uninsured motorists in accidents in New York State. *See, e.g., id.* (collecting cases); *Allstate Insurance Co. v. Libow*, 106 A.D.2d 110, 482 N.Y.S.2d 860 (2d Dep't 1984) (prohibiting stacking of $10,000 maximum for personal injury and $50,000 for wrongful death under § (f)(1) endorsement when plaintiff's decedent died one month after sustaining injuries), *aff'd*, 65 N.Y.2d 807, 493 N.Y.S.2d 127, 482 N.E.2d 923 (1985); *Sisson v. Travelers Insurance Cos.*, 94 A.D.2d 953, 464 N.Y.S.2d 77 (4th Dep't 1983).

Section (f)(2), enacted in 1977, is naturally read as the legislature's attempt to remedy this lacuna:

Any such policy [of motor vehicle liability insurance as characterized in § (f)(1)] shall, at the option of the insured, also provide supplementary uninsured motorists insurance for bodily injury, in an amount up to the bodily injury liability insurance limits of coverage provided under such policy, subject to a maximum of one hundred thousand dollars because of bodily injury to or death of one person in any one accident and, subject to such limit for one person, up to three hundred thousand dollars because of bodily injury to or death of two or more persons in any one accident. Supplementary uninsured motorists insurance shall provide coverage, in any state or Canadian province, if the limits of liability under all bodily injury liability bonds and insurance policies of another motor vehicle liable for damages are in a

lesser amount than the bodily injury liability insurance limits of coverage provided by such policy. As a condition precedent to the obligation of the insurer to pay under the supplementary uninsured motorists insurance coverage, the limits of liability of all bodily injury liability bonds or insurance policies applicable at the time of the accident shall be exhausted by payment of judgments or settlements.

The first two sentences of § (f)(2) authorize two distinct things. The first sentence *requires* the insurer to offer SUMI at the insured's request, in amounts up to the statutory bodily injury liability limits. The second sentence provides that SUMI will serve as underinsurance for injuries suffered in the United States or Canada. Defendant's view is that the second sentence *defines* SUMI—that is, that SUMI is to be *identified* with underinsurance, and does not provide coverage against uninsured motorists at all.

We reject defendant's reading of the statute. Rather, we read the first sentence of § (f)(2) as authorizing—requiring, at the option of the insured—the issuance of *uninsured* motorists coverage in amounts greater than $10,000/$20,000 and for states other than New York and Canadian provinces. The second sentence then goes on not to define SUMI, but to make clear that SUMI is a special kind of uninsured motorists coverage—one that protects against underinsurance if the SUMI holder is involved in an accident with an insured vehicle, in the § (f)(1) sense of "insured," with lower coverage maxima than the SUMI holder. Logic and New York case law support this reading, and the legislative history does not contradict it.

The legislative history of § (f)(2) is scant, being limited, so far as this Court can determine, to the Memorandum of the State Executive Department called to our attention in *Downey*, 1977 N.Y. Laws 2445–46. This Memorandum explains that § (f)(2)

> would ... require that persons insured under the Assigned Risk Plan are offered the option of purchasing a new type of coverage, called "supplementary uninsured motorists insurance." This new coverage would be excess to the liability coverage of the other automobile in the accident. Thus, by purchasing this option, the insured would obtain the same level of protection for himself and his passengers which he purchased to protect himself against liability to others and would not be limited to the coverage of the other automobile.

*Id.* The Memorandum does *not* say that the "new coverage would be excess to the liability coverage of the other automobile" only if the other automobile is uninsured in the § (f)(1) sense. Thus, the legislative history is consistent plaintiff's position here. To read the statute as defendant suggests, moreover, would lead to anomalous results. SUMI provides coverage "if the limits of liability under all bodily injury liability bonds and insurance policies of another motor vehicle liable for damages are in a lesser amount than the bodily injury liability insurance limits of coverage provided by such policy." Manifestly, for a vehicle without liability insurance the limits of liability will be zero: by its terms, in such a case SUMI will make up the entire difference between zero and the limits of the SUMI holder's coverage. Thus, SUMI is a form of uninsured motorists coverage. Indeed, as a matter of logic no absolute distinction can be drawn between uninsured motorists coverage and underinsurance coverage: uninsured motorists coverage is simply the limiting case of underinsurance in which the tortfeasor's vehicle has less coverage than the insured's, because it has *no* coverage.

Moreover, because § (f)(1) coverage is limited to accidents occurring within New York State, SUMI is the only uninsured motorists coverage available to New York motorists involved in out-of-state accidents with uninsured motorists. Thus, in *Home Indemnity Co. v. Allwood*, 121 Misc.2d 757, 471 N.Y.S.2d 824 (1984), because the fatal accident occurred outside New York State, the court held that the insurer was not liable for the $50,000 in wrongful death benefits provided by the statutory § (f)(1) endorsement. The court went on to ob-

serve that "[t]he issued policy has another relevant endorsement: 'Part IV—Protection Against Uninsured Motorists,' which is voluntary supplementary uninsured motorist insurance for bodily injury pursuant to [§ 3420(f)(2) ]. This endorsement is applicable since its coverage is not limited to accidents occurring within New York State." 471 N.Y.S.2d at 825 (footnote omitted). The court issued a declaration that the insurer's liability was limited to the $10,000 provided by the SUMI endorsement even though the § (f)(1) limits are higher, thereby illustrating both that § (f)(1) coverage and SUMI are distinct and that SUMI is a form of uninsured motorists coverage. Because of the mandatory character of § (f)(1) coverage, SUMI is redundant or underinclusive as to New York accidents when purchased in amounts of $10,000 or less; but this should not disguise the fact that it is UM coverage, in New York or elsewhere.

Thus, we see the legislature as having set out the following statutory scheme:

§ (f)(1): requires maximum of $10,000/$20,000 UM coverage for New York accidents involving any of the classes of vehicles enumerated in § 5202, but does not authorize sale of more than $10,000/$20,000 worth of coverage for such accidents;

§ (f)(2): requires offering, at insured's option, expanded coverage, applicable throughout U.S. and Canada, against uninsured *and underinsured* motorists.

Our decision in *Downey* rests on this view of the statute, as when we said:

The bodily injury liability insurance of [the driver who injured plaintiff Downey] was limited to $10,000 per person, the statutory minimum, while plaintiffs' bodily injury liability limits were $100,000. By statutory definition, the other driver was an "uninsured motorist" because his liability limits were less than the liability limits provided by the plaintiffs' insurance policy. N.Y.Ins.L. § 3420(f)(2) (McKinney 1985).

In *Downey*, as the citation reveals, we meant that the negligent driver was uninsured "by statutory definition" for pur-

poses of SUMI, which, as we have now explained, encompasses both uninsured and underinsured motorists. The view of SUMI we express here and in *Downey* allows us to use "uninsured" and "underinsured" interchangeably in the SUMI context. Such cases as *Neals, supra,* remind us only that we cannot use these terms interchangeably in the § (f)(1) context: such drivers as Jacobson, or the other driver in *Downey*, are not uninsured in the sense of § (f)(1), though they are underinsured with respect to the plaintiffs in each case, and so uninsured in the sense of § (f)(2). *Neals*, therefore, is consistent with our view in *Downey*.

More importantly, our view in *Downey* is the view explicitly stated by the New York Court of Appeals in *Reichel v. Government Employees Insurance Co.,* 66 N.Y.2d 1000, 499 N.Y.S.2d 385, 489 N.E.2d 287 (1985). In *Reichel*, a dispute over the recovery due the insured under a UM endorsement was submitted to arbitration, as required by § (f)(1). The arbitrator returned an award for wrongful death of $100,000. Because this amount was $50,000 more than the statutory maximum set by § (f)(1), the court concluded that even though the arbitration was compelled pursuant to § (f)(1), the award was made pursuant to plaintiff's § (f)(2) SUMI endorsement.

Because the arbitration award in this case set the insured's liability for the deceased's hit-and-run death at $100,000, greater than the standard $50,000 limitation, we cannot accept appellant's argument that the award was made pursuant to the standard Uninsured Motorist (Family Protection) coverage endorsement of the policy.

Although the extra coverage purchased by the insured here is commonly referred to as "underinsurance," ... it is nonetheless uninsured motorists coverage. Indeed, the statutory authorization for such additional coverage is found within this State's mandatory uninsured motorist coverage scheme, which describes this coverage as "Supplementary *Uninsured* Motorist Insurance." ...

The statutory allowance for supplementary uninsured motorists insurance coverage expands the "uninsured motorist" category to include one who, while maintaining proof of financial responsibility as required by law, and thus being an "insured motorist," nevertheless may be considered an "uninsured motorist" because he is "underinsured" when compared to the coverage of an insured who has exercised the option to purchase supplementary insurance.

*Reichel,* 66 N.Y.2d at 1002–1003, 499 N.Y. S.2d at 385–86, 489 N.E.2d 1287.

Thus logic, our decision in *Downey,* and the New York Court of Appeals combine to refute defendant's claim that SUMI and UM coverage are distinct *kinds* of motor vehicle liability insurance. *Reichel,* in particular, unequivocally rejects defendant's argument that Morris's policy does not cover his accident with Jacobson because Jacobson was financially responsible as required by the Vehicle and Traffic Law, and hence not "uninsured." *Reichel* confirms the propriety of the specific language we used in *Downey:* it is correct to speak of a financially responsible motorist as "uninsured" for § (f)(2) purposes if he is underinsured.

In light of these settled usages, defendant's argument that a motor vehicle liability policy provides SUMI rather than § (f)(1) UM coverage only if the policy or the declarations page actually contain the magic word "SUMI" is without force. For example, defendant's heavy reliance on the discussion in *In re Metropolitan Property & Liability Insurance Co. v. Villarubia,* 119 A.D.2d 576, 500 N.Y.S.2d 744 (2d Dep't 1986), is inapt:

The "declarations" page of the respondent's automobile insurance policy indicates that she purchased "uninsured" motorist coverage with policy limits of $10,000 for the injury of one person in any one accident.... [I]n order to be covered against "underinsured" motorists, an insured must purchase optional "Supplementary Uninsured Motorist Insurance".... Since the "declarations" page of the policy fails to indicate that

the respondent purchased that type of insurance, the petition should have been granted.

500 N.Y.S.2d at 744. This is not, as defendant would have it, a holding that any declarations page that fails to contain the magic phrase "SUMI" reflects the purchase only of UM coverage. For the coverage in *Villarubia* was for $10,000, the statutory amount of UM coverage. If the amounts had been different, the *Villarubia* court could have concluded, and in light of *Reichel* ought to have concluded, that SUMI had been purchased. Similarly, defendant's reliance on *Metropolitan Property & Liability Insurance Co. v. Cassidy,* 127 Misc.2d 641, 486 N.Y.S.2d 843 (1985), is misplaced. That case says merely that " '[u]nderinsurance' is alluded to in [the] Insurance Law ... by the terminology 'supplementary uninsured motorist insurance,' " which is not to say that SUMI is *identical* with underinsurance.

In sum, defendant has been unable to cite authority that persuades us that we have misunderstood the legislative scheme, according to which § (f)(1) UM coverage is limited to a maximum of $10,000/$20,000. This understanding of the statutory scheme requires the conclusion that whether or not a policy and its declarations page contain the phrases "SUMI" or "underinsurance," any UM coverage over $10,000/$20,000 is to be construed as SUMI, by operation of law.

We would, perhaps, not be compelled to draw this conclusion if defendant could demonstrate that its UM endorsement is by its unambiguous terms an § (f)(1) endorsement, so that there is no need for this Court to engage in construction of the contract. To this end, defendant might observe that the policy in *Reichel* contained two endorsements, one of which was called a SUMI endorsement, so that the Court of Appeals did not read a SUMI endorsement into the contract in that case. Similarly, the court in *Allwood* noted that the policy at issue contained two endorsements: one was clearly the statutorily required UM endorsement, and the court looked behind the caption of the other, "Protection

Against Uninsured Motorists," to determine that it provided SUMI.

The *Reichel* court, however, gives no indication that it disposed of the case on the ground that Reichel's policy contained an endorsement with the magic phrase "SUMI." Rather, it was impressed by the presence, on the declarations page, of the controlling amounts of coverage, $100,-000/$300,000 per accident, which are unavailable under the mandatory § (f)(1) endorsement:

> We find no ambiguity in the policy requiring a strict construction of the policy that would resolve the ambiguity against the insured.... The policy's face sheet, wherein the afforded coverage is recorded, clearly indicates that with respect to uninsured motorists, coverage will extend up to $100,000/$300,-000 per accident, amounts only available under a supplementary uninsured motorist coverage indorsement since they are in excess of the maximum uninsured motorist coverage ... required by Insurance Law § 3420.

*Reichel*, 499 N.Y.S.2d at 386, 489 N.E.2d 1287 (citation omitted). The teaching of *Reichel*, then, is that a court is to construe a New York policy with coverage in excess of the § (f)(1) limits, as providing SUMI. In the instant case as in *Reichel*, the declarations page of the policy provides coverage well in excess of the § (f)(1) limits—coverage, indeed, at the § (f)(2) limits. Under these circumstances, we do not hesitate to draw the conclusion that Morris purchased SUMI under the name "uninsured motorists coverage."

Defendant has furnished this Court with a certified copy of the policy it sold to Morris. Our scrutiny of that policy persuades us that even though Part III of that policy is captioned "Uninsured Motorists Coverage," it differs from the UME required by the terms of § (f)(1) in four ways:

1. The endorsement begins by reciting: "If you pay us a premium for Uninsured Motorists Coverage as shown on the Declarations Page then we will pay damages for bodily injury which a covered person is legally entitled to recover from the owner of an uninsured motor vehicle." This conditional language means that the proposed insured can elect not to pay the premium, thereby foregoing the coverage. That is, the coverage is optional. Coverage under § (f)(1) is mandatory, however, so that this cannot be a § (f)(1) endorsement;

2. The endorsement nowhere states that the maximum coverage is $10,000 per bodily injury, as specified by § (f)(1);

3. The definition of covered vehicles is underinclusive: "Uninsured motor vehicle means a land motor vehicle or trailer of any type: 1. To which no bodily injury liability bond or policy applies. 2. Which is a hit and run vehicle whose owner cannot be identified.... 3. To which a bodily injury liability bond or policy applies at the time of the accident but the bonding or insuring company denies coverage or is or becomes insolvent." Thus, under this endorsement Morris was not insured against at least four kinds of vehicles for which § (f)(1) requires coverage: vehicles registered out-of-state with coverage below the New York maximum (as in *Neals*); stolen vehicles; vehicles operated without the consent of the owner; and unregistered vehicles;

4. The endorsement does not specify that its coverage is limited to accidents occurring in New York State, as § (f)(1) requires. Indeed, the "General Provisions" of the policy provide that "[t]he policy territory is the United States of America, its territories or possessions, or Canada."

For all these reasons, Part III of the policy offered to this Court is not the UME required by § (f)(1). Possibly judicial construction of Part III could cure the second, third, and fourth defects. It would be inequitable to cure the second, however, by reading into Part III a restriction of coverage to $10,000, inasmuch as Morris paid, and defendant accepted, premiums for $100,000 worth of such coverage. And in any case the optional character of Part III cannot be cured. Like the court in *Allwood*, then, we must look behind the caption of the policy, and in so doing find that

as a matter of law we must read Part III as an § (f)(2) endorsement.

In light of the dispositive holding of the New York Court of Appeals in *Reichel*, the letter Morris solicited from the New York Insurance Department requires only brief comment. The relevant passage from that letter reads:

> An insurer must provide the coverage mandated by § 3420(f)(1). Pursuant to the statute, the limits cannot exceed $10,-000/$20,000. The coverage which § 3420(f)(2) makes available to the insured is optional. If selected, it supplements the mandatory § 3420(f)(1) coverage but cannot exceed the limits of the owner's liability coverage, subject to the limits stated in the subsection.

Letter of Martin Minkowitz, Deputy Superintendent and General Counsel, New York Department of Insurance, to Raymond J. Keegan, Esq., April 15, 1987, at 3.

In *Downey*, we held that a Circular Letter issued by the Superintendent did not have the force of law inasmuch as it was not filed as the New York Constitution requires. 638 F.Supp. at 326. Still less should an *ex parte* communication between the Department and the attorney for a claimant have anything other than precatory effect. Counsel for the Department rightly observes that "[i]t is not the Department's function to interject itself in a dispute between a claimant and an insurer, particularly when the issues are before the Court." Letter at 3. However, we also remarked in *Downey* concerning Circular Letters that

> Advisory promulgations by the Superintendent of Insurance may indeed assist the industry in comprehending and implementing legislative directives, and the reasonable interpretations of the Superintendent are and should be accorded some weight.... To the extent these letters provide guidance, impart general standards, and introduce predictability in ascertaining insurance department policy should the Superintendent be required to render a decision on the matter, they serve the public, even while lacking the force of statutory authority.

638 F.Supp. at 326. Here, counsel for the Department observes that "the Department, as it did here, will issue its interpretation of the controlling statute which it is required to administer" and that the Department will investigate allegations of failure to comply with the Insurance Law as the Department interprets it. Letter at 3. Thus, even bearing in mind the difference between a Circular Letter sent to all licensed New York insurers and an *ex parte* letter such as the present one, we believe that the *ex parte* letter expresses the Superintendent's interpretation of § 3420, and is entitled to some weight. In the present circumstances, it is appropriate to regard the letter as corroborating this Court's own independent analysis of the statute and as supplementing the position expressed by the New York Court of Appeals in *Reichel*.

Counsel for the defendant, by letter to this Court dated April 22, 1987, expresses skepticism about the view that "the maximum uninsured motorist coverage that can be offered pursuant to statute is $10,-000/$20,000." Letter of David W. Brand, April 22, 1987, at 2. Counsel remarks that "This is quite confusing and is not supported by a reading of the statute. Personally, in the last three years in my own insurance policies with two different insurance companies, I have carried $100,-000/$300,000 uninsured motorists coverage." *Id.* Counsel attaches to his letter a copy of the declarations page of his own automobile liability insurance policy, on which he has circled separate coverages for "uninsured motorists" and "underinsured motorists" in the amounts of $100,-000/$300,000. We note, however, that the declarations page recites a premium for "uninsured motorists" coverage only: under "underinsured motorists" the corresponding entry is "incl." The obvious inference is that counsel carries § (f)(2) coverage, and that his insurance company notes this fact on its declarations page under two headings, even though counsel pays only one premium. Counsel's letter is, therefore, not even colorably relevant to the present case.

In sum, we conclude that by increasing his UM coverage to $100,000/$300,000, Morris purchased SUMI. Michael Jacobson was therefore, an uninsured motorist as to Morris, in the sense of § 3420(f)(2).

Settle a final judgment on notice which shall declare the rights of the parties consistently with the foregoing.

So Ordered.