MAGANN EQUIPMENT, INCORPORATED, ET AL.

V.

DONNIE RUSSELL BUFFKIN, D/B/A, ETC., ET AL.

Record No. 880779

November 10, 1989

Present: Carrico, C.J., Compton, Stephenson, Russell, Thomas,* Whiting, and Lacy, JJ.

---

* Justice Thomas participated in the hearing and decision of this case prior to the effective date of his resignation, November 1, 1989.

John M. Oakey, Jr. (Barbara Ann Williams; McGuire, Woods, Battle & Boothe, on briefs), for appellants.

H. Aubrey Ford, III (Browder, Russell, Morris & Butcher, on brief), for appellees Donnie Russell Buffkin, d/b/a/ D & R Trucking Company and St. Paul Fire and Marine Insurance Company

S. Vernon Priddy, III (M. Pierce Rucker; Sands, Anderson, Marks & Miller, on brief), for appellee Hartford Fire Insurance Company.

No brief or argument for appellee J. Edward Dunivan, Administrator of the Estate of Stephen Harlow, Jr.

Justice Lacy delivered the opinion of the Court.

In this case we determine whether the insurance policy carried by an Interstate Commerce Commission (ICC) certificated motor carrier provides primary or excess coverage for injuries resulting from the negligent operation of a motor vehicle under lease to the carrier.

Donald Russell Buffkin owned a tractor trailer which he operated under a lease with a certificated interstate motor carrier, Magann Equipment, Incorporated (Magann). On October 20, 1983, Buffkin delivered freight for Magann from Georgetown, South Carolina to Fredericksburg. Buffkin then contacted Magann's dispatcher and was told that Magann had no return load, but that a return load for Carolina Freight Carriers Corporation might be available in Norfolk. While on the way to Norfolk, Buffkin's tractor trailer collided with an automobile driven by Stephen Harlow, Jr., who was killed in the accident.

J. Edward Dunivan, Administrator of Harlow's estate, filed a wrongful death action against Magann, Buffkin and Magann's liability insurance carrier, Carolina Casualty Insurance Company (Carolina Casualty). Hartford Fire Insurance Company (Hartford) filed suit against the same defendants to recover payments Hartford made as the workers' compensation carrier for Harlow's employer. Buffkin and his liability insurance carrier, St. Paul Fire

and Marine Insurance Company (St. Paul), filed this action for a declaratory judgment against Magann, Carolina Casualty, Dunivan and Hartford to determine the respective rights of the parties.[1]

Relying on *Bankers & Shippers Ins. Co.* v. *Watson*, 216 Va. 807, 224 S.E.2d 312 (1976), the trial court found that at the time of the accident the lease between Magann and Buffkin was in effect and that Buffkin was under the exclusive control, direction, and supervision of Magann. The court then stated that the Carolina Casualty policy was "designed to provide insurance covering Magann's responsibility as an authorized interstate carrier" and it could not "reach any conclusion but that Carolina Casualty is a primary insurer." In addition, the trial court found that Buffkin's policy with St. Paul also provided primary coverage for the accident.

As a result of these findings, the trial court held that Carolina Casualty and St. Paul were co-primary insurers of claims arising out of Buffkin's accident and were liable for the total exposure in the proportion that each policy had to the total coverage available. The St. Paul policy had a $100,000 limit and the Carolina Casualty policy had a $1,000,000 limit. Therefore, Carolina Casualty was liable for ten-elevenths of the exposure and St. Paul was liable for one-eleventh of the exposure.

Carolina Casualty and Magann appealed, maintaining that neither the ICC endorsement to Magann's policy nor federal regulations required a finding that Carolina Casualty was a primary insurer for the vehicle at the time of this accident. Furthermore, they argued that Buffkin was not exclusively engaged in Magann's business at the time of the accident and, therefore, by its terms, Magann's policy with Carolina Casualty provided only excess, not primary coverage.[2]

We granted the appeal and now affirm.

---

[1] The actions filed by Hartford and Dunivan have been held in abeyance pending resolution of this litigation.

[2] Initially Magann and Carolina Casualty asserted that their policy did not provide any coverage because the equipment lease agreement required Buffkin to carry deadhead insurance. Because the accident occurred when the truck was empty or on a "deadhead run," Magann and Carolina Casualty insisted that the lease fixed "responsibility for the accident squarely upon Buffkin and St. Paul." In their reply brief and at oral argument, however, Magann and Carolina Casualty did not take the position that their policy provided no coverage; rather they asserted that the policy provided only excess, not primary, coverage.

## I. ICC Endorsement

■ To operate as an interstate motor carrier, Magann was required to hold a certificate issued by the Interstate Commerce Commission. To obtain that certificate, a carrier must have liability insurance coverage for "bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles under the certificate . . . ." 49 U.S.C. § 10927(a)(1) (1982); *see,* 49 C.F.R. § 1057.12(j) (1988). Vehicles leased by the certificated carrier may be operated under its certificate, if the carrier has control of, and responsibility for, the equipment while under lease, and the vehicles must display the carrier's identification and ICC certificate numbers. 49 C.F.R. §§ 1057.12, 1058.2 (1988).

Magann complied with all three conditions. Its lease with Buffkin provided that Magann had "complete and exclusive control, firection [sic] and supervision" of Buffkin's truck and its driver during the term of the lease. Magann's placards and ICC number were displayed on Buffkin's truck. Magann maintained a liability insurance policy with Carolina Casualty which included the required ICC endorsement. The lease, the placards, and the insurance policy were all in place and effective on the date of the accident.

Magann argues that, because sufficient insurance is available to pay any judgment ultimately imposed, the public protection purpose of the ICC regulations and requirements has already been met in this case and, therefore, the only controversy remaining is allocation of the financial responsibility among the insurers. Under these circumstances, Magann urges us to adopt the view that the policy's ICC endorsement is required for public protection purposes only, has no application in a dispute between insurance carriers and should be ignored, leaving determination of excess or primary coverage to interpretation of the remaining policy terms under traditional state law principles.

Buffkin and St. Paul, on the other hand, rely on the language of the ICC endorsement as imposing primary coverage on the Carolina Casualty policy. They direct us to *Empire Fire and Marine Insurance Co.* v. *Guaranty National Insurance Co.,* 868 F.2d 357 (10th Cir. 1989), for a recent case analyzing the development and status of the law in this area.

■ In *Empire,* the Tenth Circuit divided the federal court holdings on this issue into three categories:

(1) The court below held that the endorsement makes the insurance policy to which it is attached primary as a matter of law over all other insurance policies that lack similar provisions. [citation omitted]

(2) Other courts have held that the endorsement only negates limiting provisions in the policy to which it is attached, such as an "excess coverage" clause, but does not establish primary liability over other policies that are also primary by their own terms. *American Gen. Fire & Casualty Co.* v. *Truck Ins. Exch.*, 660 F. Supp. 557, 569 (D. Kan. 1987). (3) Other courts have held that the endorsement applies only to situations in which a claim is being asserted by a shipper or a member of the public, and that the endorsement does not apply when allocating liability among insurance carriers. *E.g.*, *Carter* v. *Vangilder*, 803 F.2d 189, 191-92 (5th Cir. 1986); *Transport Indem. Co.* v. *Paxton Nat'l Ins. Co.*, 657 F.2d 657, 659 (5th Cir. 1981), *cert. denied*, 455 U.S. 982, 102 S. Ct. 1490, 71 L.Ed.2d 692 (1982); *Carolina Casualty Ins. Co.* v. *Underwriter's Ins. Co.*, 569 F.2d 304, 313 (5th Cir. 1978).

868 F.2d at 361.

The Tenth Circuit could find nothing in the language of the ICC endorsement under consideration which "purporte[d] to make the insurance policy to which it is attached primary over all other primary insurance policies." 868 F.2d at 363. But the court declined to ignore the endorsement entirely. There was language in the endorsement which provided that "no condition, provision, stipulation or limitation contained in the policy . . . shall relieve the company from liability." 868 F.2d 361, 363. To give effect to this clause, the Tenth Circuit held that the clause operated to negate provisions found elsewhere in the policy, such as excess coverage clauses, which would limit the carrier's liability.

The court explained that this approach was consistent with the origin of the ICC endorsement which demonstrated "the ICC's desire that the public be adequately protected." 868 F.2d at 362. Additionally, the Tenth Circuit suggested that this application of the endorsement supports the policy established by the United States Supreme Court in *Transamerican Freight Lines, Inc.* v. *Brada Miller Freight Systems, Inc.*, 423 U.S. 28 (1975), where it ruled that allocation of financial responsibility between the certifi-

cated carrier and its lessor does not "in and of itself, offend the [ICC] regulations so long as the lessee does not absolve itself from the duties to the public and to shippers imposed upon it by the Commission's regulations". 423 U.S. at 40. In *Brada* the Court found that an indemnification agreement in an equipment lease did not alter this duty to the public.

In *Empire*, however, the Tenth Circuit found that the required ICC endorsement was the precise mechanism which provided the necessary protection to the public and shippers by negating the limiting language in the policy. Therefore, because the endorsement is such an integral part of the ICC regulatory scheme, selective application of the endorsement, depending on the parties to the dispute, would not satisfy the requirements of *Brada*.

The Tenth Circuit acknowledged that the Fifth, Third, and Seventh Circuits have adopted a different approach, but simply declined "to follow these cases . . . insofar as they disregard the effect of an ICC endorsement on the policy to which it is attached when the public or a shipper is not involved in the dispute." 868 F.2d at 367.

■ While there are reasonable policy interests supporting both the inclusion and exclusion of the ICC endorsement in cases not involving a shipper or the public, we think the endorsement language itself is the first determinative factor. In this case, the ICC endorsement is designated as form MCS-90.[3] This endorsement form contained the following language:

> The policy to which this endorsement is attached provides primary or excess insurance, as indicated by 'X' for the limits shown:

> [xx] This insurance is primary and the company shall not be liable for amounts in excess of $500,000.CSL____for each accident.

> [ ] This insurance is excess and the company shall not be liable for amounts in excess of $_____ for each accident in excess of the underlying limit of $_____ for each accident.

---

[3] On its face, the endorsement form, MCS-90, was issued beginning in July 1981, and its use was to expire on June 30, 1983.

This clause allows designation of the policy as providing primary or excess coverage and, in this case, the primary coverage designation was chosen. In virtually all the cases cited by the parties regarding the endorsement, with the exception of one which is discussed below, the courts reviewed the language in the ICC endorsement form referred to as B.M.C. 90.[4] This endorsement form contained no reference to the primary or excess nature of the policy.

Of the cases cited, only *Carter* v. *Vangilder*, 803 F.2d 189 (5th Cir. 1986), involved an ICC endorsement containing language specifically stating that the lessee's policy was primary. Relying on a previous Fifth Circuit case, *Carolina Casualty Insurance Co.* v. *Underwriters Insurance Co.*, 569 F.2d 304 (5th Cir. 1978), the court in *Carter* held that "[u]nder federal law, an ICC endorsement does not require that an excess coverage clause in an insurance policy be read out of the policy . . . ." 803 F.2d at 191.[5] The court neither reviewed the language of the endorsement involved in *Underwriters* nor compared it to the endorsement in *Carter*.[6]

To follow *Carter* requires a holding that, as a matter of law, the ICC endorsement, regardless of its language, must be ignored in disputes not involving the public or a shipper. Because the courts in *Carter* and *Underwriters* failed to focus on the actual terms of the endorsements at issue, we do not find *Carter* persuasive, and decline to adopt its reasoning here.

Both the ICC endorsement forms, B.M.C. 90 and the MCS-90 at issue in this case, contain the following language:

---

[4] *See, e.g., Empire*, at 360-61; *Nowak* v. *Transport Indemnity Co.*, 120 Wis.2d 635, 637 n.1, 358 N.W.2d 294, 296 n.1 (1984); *Great Western Casualty Co.* v. *Mallinger Truck Line, Inc.*, 640 S.W.2d 479, 483, 484 n.2 (Mo. Ct. App. 1982); *Transport Indem. Co.* v. *Paxton Nat'l Ins. Co.*, 657 F.2d 657, 659 n.4 (5th Cir. 1981); *Carolina Casualty Ins. Co.* v. *Insurance Co. of North America*, 595 F.2d 128, 136 n.25 (3rd Cir. 1979); *Underwriters*, at 310 n.18.

[5] The court also cited *Gaskin* v. *Jowers*, 775 F.2d 621, 623 (5th Cir. 1985), and *Paxton*, 657 F.2d at 659. *Gaskins* did not consider the endorsement at all, but followed *Underwriter's* holding that the ICC *regulations* do not make a lessee's policy primary as a matter of law. *Paxton* involved the B.M.C. 90 endorsement.

[6] In fact, no ICC endorsement was a part of the policy in *Underwriters*. There, the court imputed an ICC endorsement to the lessee's policy and cited to the endorsement then in effect — B.M.C. 90. 569 F.2d at 310 n.18, 312.

> It is understood and agreed that no condition, provision, stipulation or limitation contained in the policy . . . shall relieve the Company from liability. . . . However, all terms, conditions and limitations in the policy to which this endorsement is attached are to remain in full force and effect. . . .

In our opinion, this language is unclear as to the effect of the endorsement on the rest of the policy. However, in this case, although this language remains in the endorsement, the provision added in MCS-90 eliminates any ambiguity regarding primary or excess coverage. We are unaware of any law or policy which would justify ignoring language as plain as this depending on the nature of the parties to the suit.

■ Therefore, we conclude that the language of the ICC endorsement at issue here, form MCS-90, by its terms clearly designates the coverage provided by Carolina Casualty as primary, regardless of whether the contestants are insurers, the public or shippers. This holding, however, does not make Carolina Casualty the sole provider of primary coverage and does not displace the primary nature of the St. Paul coverage.

## II. The Policy

Even if the Fifth Circuit in *Carter* is correct, and the federal law requires us to ignore the ICC endorsement in disputes between the parties' insurers, Carolina Casualty remains a provider of primary insurance under the remaining policy terms in this case.

■ The "Other Insurance" provisions provide that Magann's policy is primary only if (1) the vehicle is an owned vehicle; or (2) if a non-owned vehicle, as in this case, it was being used exclusively in Magann's business at the time of the accident. The trial court, relying on *Bankers & Shippers*, held that Buffkin was engaged in the exclusive business of Magann at the time of the accident. We concur.

The record reflects that the lease was in effect. Magann allowed his lessees to operate under his ICC certificate on hauls, particularly backhauls, when he had no loads for them. The trial court found this to be an accepted and customary procedure between Magann and his lessees. This arrangement assisted Magann in attracting independent owners of trucks as lessees by allowing them to earn money when Magann had no direct load for them. Addi-

tionally, Buffkin was directed to Norfolk by Magann's dispatcher. After the accident, Magann filed the motor carrier accident report for the Bureau of Motor Carrier Safety of the Federal Highway Administration stating that Magann was the carrier whose driver was involved. Magann also filed a claim with his workers' compensation carrier on Buffkin's behalf. As stated by the trial court, these facts are "stronger" than the facts in *Bankers & Shippers* to support a finding that Buffkin was operating exclusively in Magann's business at the time of the accident.

■ We conclude that the terms of Magann's liability policy with Carolina Casualty, with or without the ICC endorsement, as applied to the facts of this case, provide primary coverage for the October 20, 1983 accident involving Buffkin and Harlow. The trial court properly found Carolina Casualty and St. Paul co-primary insurers and assigned their liability on a pro-rata basis. Therefore, we will affirm the judgment of the trial court.

*Affirmed.*