617 A.2d 578

**Allen Ray NOLT et al.**

**v.**

**UNITED STATES FIDELITY AND GUARANTY COMPANY.**

**No. 28, Sept. Term, 1992.**

Court of Appeals of Maryland.

Jan. 12, 1993.

54

J. Mitchell Kearney (James R. Eyler, Miles & Stockbridge, both on brief), Laura C. Walters (Alva P. Weaver, III, Weaver and Bendos, all on brief), Baltimore, for petitioner.

Christopher J. Heffernan and Robert L. Ferguson, Jr. (Thieblot, Ryan, Martin & Ferguson, all on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, and ROBERT M. BELL, JJ.

KARWACKI, Judge.

In this case we interpret two automobile liability policies issued by different insurers which covered the same motor vehicle to allocate the risk which arose from the negligent operation of that vehicle.

## I.

Allen Ray Nolt ("Nolt") was the owner of a 1978 Ford tractor truck registered in the Commonwealth of Pennsylvania. Starting in 1984, Nolt entered into annual leases of that truck to Lester R. Summers, Inc. ("Summers"), an Interstate Commerce Commission ("ICC") authorized common carrier. Such a lease was in effect when Nolt was driving his tractor with a trailer in tow along Md. Route 213 in Cecil County on December 6, 1988. At the time, Nolt was hauling a load for another ICC authorized common carrier, Charles M. Shirk Trucking Co. ("Shirk"), under a separate "one day trip" lease. That morning, Nolt negligently collided with a vehicle driven by Mary Ellen Hardesty near the intersection of Md. Routes 213 and 273. Ms. Hardesty sustained severe injuries; her passenger, Eva Linda Collins, was killed.

A suit was filed in April, 1989, by the personal representative and survivors of Mrs. Collins against Nolt, Summers, and Shirk claiming $4,639,513 in compensatory damages. Shirk's insurance carrier, United States Fire Insurance Company ("U.S. Fire"), admitted coverage and provided a defense for Nolt. Summers' insurance carrier, United States Fidelity & Guaranty Company ("U.S.F. & G."), alleging that Nolt was operating the truck at the time of the accident without Summers' permission, disclaimed coverage and denied a duty to defend. Nolt then filed a declaratory judgment action in the Circuit Court for Cecil County, seeking a determination of his coverage under the U.S.F. & G. policy and claiming fees and expenses incurred in defending the underlying tort action and in prosecuting the declar-

atory judgment action. As an interested party, U.S. Fire was also named as a defendant.

The declaratory judgment action was heard by a jury on September 19 and 20, 1990. After the jury responded to specific questions of fact in a special verdict, the court entered its judgment, declaring that Nolt was "afforded *pro rata* insurance coverage" under the policies issued by U.S. Fire and U.S.F. & G., that U.S.F. & G. was jointly liable with U.S. Fire for Nolt's attorneys fees and expenses incurred in defending the underlying tort action, and that U.S.F. & G was responsible for the attorneys fees and expenses which Nolt incurred in maintaining the declaratory judgment proceeding.[1] U.S.F. & G. appealed.

The Court of Special Appeals reversed. *U.S.F. & G. v. U.S. Fire,* 90 Md.App. 327, 600 A.2d 1178 (1992). The intermediate appellate court held that U.S. Fire provided the primary coverage for the liability resulting from the accident, that U.S.F. & G. provided only excess coverage, that U.S. Fire was solely responsible for the cost of defending the underlying tort action, and that U.S.F. & G was not liable for the attorneys fees and expenses incurred by Nolt in the declaratory judgment action. We issued our writ of certiorari to review that judgment on the petitions of Nolt and U.S. Fire.

## II.

Evidence presented at trial revealed that Nolt entered into annual leases of his tractor to Summers whereby Summers would hire Nolt to operate the tractor on a job-by-

---

1. The trial court did not determine the amount of the attorneys' fees and expenses which were due by U.S.F. & G. Instead, it provided in its Order of Declaratory Judgment that "unless the parties agree, the Court will make this determination following any appeal from this order or after the time for appeal has expired." Such a declaration has the force and effect of a final judgment. Maryland Code (1974, 1989 Repl.Vol.), § 3–411 of the Courts and Judicial Proceedings Article; *Leonard v. Sav–A–Stop Servs., Inc.,* 289 Md. 204, 211, 424 A.2d 336, 339 (1981).

job basis. The lease included ICC mandated language [2] by which Summers held "exclusive possession, control, use and responsibility to the public, the shippers, and all regulatory agencies having jurisdiction" and language requiring Summers to outfit Nolt's tractor with ICC identification placards. Nolt was displaying Summers' ICC placards at the time of the accident.

Summers had not been able to provide Nolt with any work since November 23, 1988. For that reason, Nolt testified, he asked the President of Summers on December 5, 1988, for permission to use his tractor to haul for other truckers, even though the tractor was still leased to Summers. According to Nolt, he was granted that permission without any discussion of the existing lease of the tractor to Summers, for whom Nolt was going to work, his returning Summers' ICC placards, or who would insure Nolt while he was hauling other truckers' cargoes since Nolt did not independently provide liability insurance on his tractor. The President of Summers denied giving Nolt permission to use the tractor which he had leased to Summers to haul for other truckers.

On the evening of December 5, 1988, Nolt telephoned the President of Shirk looking for work. Shirk needed a tractor and driver to haul a load the next day because one of Shirk's trucks was broken down. Nolt and Shirk agreed to a one day trip lease. Shirk drew up the lease that evening, but it was not signed until after the accident. Under that lease, Nolt gave Shirk "exclusive and unrestricted control and possession" of his tractor. The lease required Shirk to provide Nolt with ICC identification placards, to "assume complete responsibility for the operation of the [tractor]," to obtain and pay for all necessary ICC permits, and to provide the liability insurance for the tractor which was required by ICC regulations.

---

**2.** 49 C.F.R. § 1057.12(c) (1986).

On December 6, 1988, Nolt began his trip for Shirk at its terminal in Ephrata, Pennsylvania. His destination was Elkton, Maryland. He was pulling a trailer owned by Shirk which contained cargo of one of Shirk's customers. Nolt had that customer's invoice and directions to the cargo's destination. Nolt operated on that day under Shirk's bill of lading. Nolt's Daily Log, which he was required to maintain by the ICC, identified Shirk as the carrier for whom he was driving. Nevertheless, Nolt's tractor bore Summers' ICC placards because Shirk forgot to give Nolt its placards when he departed from its terminal.

Both the President of Shirk and Nolt testified that Nolt was working exclusively for Shirk in making this trip. After the accident, one of Shirk's drivers was substituted for Nolt and completed the trip with Nolt's tractor pulling Shirk's trailer. Shirk was paid by its customer for the delivery, and it paid Nolt. Summers was not aware of the lease between Nolt and Shirk until after the accident. Neither Shirk nor Nolt paid any compensation to Summers for the trip.

On previous occasions Nolt had hauled cargo for truckers other than Summers, but those trips were always arranged by Summers. On those occasions Summers would make all of the arrangements, issue its own bill of lading, assign the work to Nolt and dispatch him. Under such arrangements, Nolt had hauled cargo for Shirk, but when he did, Summers was paid by the customer. Summers would pay Nolt for his work, deduct a "commission" from the profit, and then pay the balance of the profit to Shirk.

The trial court submitted two questions to the jury for special verdict:

"1. Did the Plaintiff, Allen Ray Nolt, have permission from Lester R. Summers, the owner of Lester R. Summers, Inc., to operate his truck on December 6, 1988 for Charles M. Shirk Trucking Company?

YES___ NO___

"2. If you voted "yes", then you must answer the following question.

"On December 6, 1988, was Mr. Nolt's truck used exclusively in Shirk's or Summers' business as trucker[?]

SHIRK___ or SUMMERS___ "

The jury answered the first question "yes." With permission of the trial court, the jury amended the second question and concluded that Nolt's truck was used exclusively in both Summers' and Shirk's businesses. Based on these findings by the jury, the trial court interpreted the automobile liability insurance policies issued to Shirk and Summers by their respective insurers.

### III.

U.S.F. & G. and U.S. Fire both issued like policies, in a standard form developed for the trucking industry, to their respective insureds, Summers and Shirk. Both policies provided a $1,000,000 limit of liability for any one accident or loss. Both policies obligated the insurer to defend the insured in any action arising from claims potentially within the scope of the policy.

"Insured" is defined to include, in addition to the named insured, "anyone else while using with your permission a covered 'auto' you own, hire or borrow. . . ." U.S. Fire and U.S.F. & G. agree that Nolt met this definition of insured in their policies. We concur. On December 6, 1988, Nolt's tractor truck was under lease to both Shirk and Summers, and the jury specifically found that Nolt had permission from Summers to operate that tractor truck for Shirk. U.S.F. & G. does not challenge that jury finding. It is undisputed that Nolt had permission from Shirk to operate the tractor truck in question.

The policies also contain an identical "Other Insurance—Primary and Excess Insurance Provisions" clause which provides in part:

"a. This Coverage Form's Liability Coverage is primary for any covered 'auto' while hired or borrowed by you

and used exclusively in your business as a 'trucker' and pursuant to operating rights granted to you by a public authority. This Coverage Form's Liability Coverage is excess over any other collectible insurance for any covered 'auto' while hired or borrowed from you by another 'trucker'....

\* \* \* \* \* \*

"e. When this Coverage Form and any other Coverage Form of policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion of that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis."

"Double or overlapping insurance" exists when more than one policy covers a claim involving a single vehicle. 8A *Appleman on Insurance Law and Practice,* § 4907.65 at 367 (rev. ed. 1981). Section (a) of the "other insurance" clause of the subject policies constitutes an excess clause, while section (e) of the policies' "other insurance" clause is a typical *pro rata* clause.

This Court has clearly defined a policy to address "other insurance" clause conflicts in double coverage cases:

"In cases where two or more of these 'other insurance' clauses conflict, most courts resolve the problem of double coverage by attempting to reconcile the conflicting clauses.... This approach recognizes that the rights and liabilities of the different insurers involved should depend, as far as possible, upon the specific language of the policies."

*Consolidated Ins. Co. v. Bankers Ins. Co.,* 244 Md. 392, 396, 223 A.2d 594, 596–97 (1966). Where an excess clause from one policy conflicts with a *pro rata* clause from a concurrently effective policy, we disregard the *pro rata* clause in favor of the excess clause. *Id.* at 399, 223 A.2d at 598. Where both policies provide for excess coverage only, liability is shared equally by the insurers. *Ryder Truck*

*Rental, Inc. v. Schapiro & Whitehouse, Inc.,* 259 Md. 354, 364–65, 269 A.2d 826, 831 (1970). Where the policies' *pro rata* clauses are in conflict and there are no other provisions limiting liability, the insurers share liability proportionately. *Celina Mut. Casualty Co. v. Citizens Casualty Co.,* 194 Md. 236, 241, 71 A.2d 20, 22 (1950).

Attached to each of the policies was an identical "Endorsement for Motor Carrier Policies of Insurance for Public Liability under Sections 29 and 30 of the Motor Carrier Act of 1980." (the ICC endorsement). That endorsement provided in pertinent part:

> "The policy to which this endorsement is attached provides primary or excess insurance, as indicated by ☒ for the limits shown:
>
> ☒ This insurance is primary and the company shall not be liable for amounts in excess of $1,000,000 for each accident.
>
> ☐ This insurance is excess and the company shall not be liable for amounts in excess of $_____ for each accident in excess of the underlying limit of $_____ for each accident. . . .
>
> "The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Highway Administration's Bureau of Motor Carrier Safety (Bureau) and the Interstate Commerce Commission (ICC).
>
> "In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in

the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.... It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured."

Relying on this endorsement and the jury's finding that the truck was used "exclusively in both Shirk's and Summers' businesses," the trial court declared that U.S. Fire and U.S.F. & G. shared pro rata the liability growing out of the accident of December 6, 1988. Since both insurers provided an equal amount of coverage, $1,000,000, they shared equally in that liability.

The Court of Special Appeals reversed. It held that there was insufficient evidence to support the jury's verdict that the tractor was being used "exclusively" in both Shirk's and Summers' businesses. Rather, the intermediate appellate court concluded that the undisputed evidence showed that the tractor was being used exclusively in Shirk's business as a "trucker" and pursuant to operating rights granted to Shirk by a public authority. Consequently, it discerned no conflict between the "other insurance" clauses in each policy, and held that under Section (a) of those clauses, Shirk's insurer, U.S. Fire, afforded primary coverage, and Summers' insurer, U.S.F. & G., was the excess carrier. With regard to the ICC endorsements, the Court of Special Appeals held that since the truck was being used "exclusively" in Shirk's business, only his ICC authority was implicated and that the endorsement attached to Summers' U.S.F. & G. policy did not affect its status as an excess insurer under the terms of Section (a) of the "other insurance" clauses of each policy.

IV.

Since Nolt is insured under the policies of both U.S. Fire and U.S.F. & G., we resolve this "double coverage" problem by examining the language of the policies as they both were amended by the ICC endorsement attached to each. Our analysis begins with *Federal Ins. Co. v. Allstate Ins. Co.*, 275 Md. 460, 341 A.2d 399 (1975).

In that case the plaintiff contracted with an ICC authorized "drive away" service to have his automobile driven from New York to Florida. During the trip, the driver of the plaintiff's automobile was involved in an accident. At the time, the plaintiff maintained an automobile liability policy covering his automobile with Federal Insurance Company ("Federal"). The drive away company was insured by Allstate Insurance Company ("Allstate"). After we concluded that the plaintiff was an "insured" under both policies, we resolved the question of priority of coverage. *Id.* at 477, 341 A.2d at 409. The Allstate policy contained an excess clause, while the Federal policy contained a *pro rata* clause. The Allstate policy was accompanied by an ICC endorsement similar to the ones attached to the policies in question in the instant case. Under those circumstances, we held that Allstate provided primary coverage. *Id.* at 477–78, 341 A.2d at 409–10. The ICC endorsement committed Allstate to pay " 'any final judgment recovered against the insured' ... irrespective of any 'condition, provision, stipulation or limitation contained in the policy.' " Since the excess clause in Allstate's policy was such a limitation, the ICC endorsement overrode the excess clause and rendered Allstate the primary insurer up to the limits specified in the endorsement. *Id.* at 478–79, 341 A.2d at 410. We reasoned that the intent of Congress and the ICC was that the insurance company which wrote the ICC endorsement would be responsible for primary coverage, both as a matter of law and of public policy. *Id.* at 479, 341 A.2d at 410.

There is a definite difference of opinion among the courts that have considered the effect of an ICC endorsement on one of two or more policies providing coverage for the same

claim on the issue of which policy provides primary coverage. Some courts have held that the only effect of the endorsement is to negate limiting provisions in the policy to which it is attached, such as an "other insurance" excess clause, but that it does not establish primary liability over other policies that are also primary by their own terms but which have no ICC endorsement. *Empire Fire & Marine Ins. Co. v. Guaranty Nat. Ins. Co.*, 868 F.2d 357 (10th Cir.1989); *MaGann Equip., Inc. v. Buffkin*, 238 Va. 712, 385 S.E.2d 619 (1989); *American Gen. Fire & Casualty Co. v. Truck Ins. Exch.*, 660 F.Supp. 557 (D.Kan.1987). Other courts have held that the endorsement only applies when a claim is being asserted by a shipper or a member of the public, and that the endorsement does not affect the allocation of liability among insurance carriers. *Travelers Ins. Co. v. Transport Ins. Co.*, 787 F.2d 1133 (7th Cir.1986); *Carolina Casualty Ins. Co. v. Insurance Co. of North Am.*, 595 F.2d 128 (3rd Cir.1979); *Carolina Casualty Ins. Co. v. Underwriters Ins. Co.*, 569 F.2d 304 (5th Cir.1978). These courts simply disregard the endorsement notwithstanding that, by its express terms, it amends the policy to which it is attached.

 In the instant case we are faced with a different situation than that which confronted us in *Federal Ins. Co. v. Allstate Ins. Co., supra*, and which was before the courts who have disagreed with our determination of the effect of an ICC endorsement attached to one of two or more policies which afford coverage for the same accident. Here the policies of both U.S. Fire and U.S.F. & G. contained the identical ICC endorsement which is mandated by the Interstate Commerce Act, 49 U.S.C. § 10927 (1992), in the form required by the ICC, 49 C.F.R. § 1003.3 (1991). By its express terms, that endorsement states that "[t]his insurance is primary" and "[i]t is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, a violation thereof, shall relieve the company from liability or from the payment of any final judgment, within

the limits of liability herein described...." In construing this unambiguous language we look at the policy and the endorsement as a whole, and give their terms their normal and customary meaning. *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 766–67, 556 A.2d 1135, 1138 (1989); *Federal Ins. Co. v. Allstate Ins. Co.*, 275 Md. at 473, 341 A.2d at 407. So construed, we hold that both policies afforded primary coverage for Nolt's liability resulting from the accident of December 6, 1988. We reject the view urged upon us by U.S.F. & G. that we should allocate the risk based upon a determination of whether the ICC authority of Shirk or Summers was "implicated." *Empire Indem. Insurance Co. v. Carolina Casualty Ins. Co.*, 838 F.2d 1428, 1432 (5th Cir.1988). That uncertain standard would frustrate one of the objectives of the ICC mandated endorsements, *i.e.*, the elimination of difficulties of fixing financial responsibility for damage and injuries to shippers and members of the public. *Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.*, 423 U.S. 28, 37, 96 S.Ct. 229, 234, 46 L.Ed.2d 169, 176–77 (1975). Since both U.S. Fire and U.S.F. & G. provided primary coverage, under subsection (e) of the "other insurance" clauses in their policies they must share the liability for Nolt's negligence on a *pro rata* basis.

## V.

▆ Since U.S.F. & G. shared the liability coverage with U.S. Fire on an equal basis, it breached its duty to defend Nolt in the underlying tort action. That contractual duty to defend was set forth in Section II A. of the policy issued by U.S.F. & G.:

"We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'

"We have the right and duty to defend any 'suit' asking for these damages. However, we have no duty to defend

'suits' for 'bodily injury' or 'property damage' not covered by this Coverage Form. We may investigate and settle any claim or 'suit' as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements."

Consequently, the trial court was correct in declaring that U.S.F. & G. and U.S. Fire were jointly liable for the counsel fees and expenses incurred in the defense of Nolt in the underlying suit. *Bankers & Ship. Ins. Co. v. Electro Enter., Inc.*, 287 Md. 641, 648–49, 415 A.2d 278, 282–83 (1980).

## VI.

■ The rule in this State is firmly established that when an insured must resort to litigation to enforce its liability insurer's contractual duty to provide coverage for its potential liability to injured third persons, the insured is entitled to a recovery of the attorneys' fees and expenses incurred in that litigation. *Continental Casualty Co. v. Bd. of Educ.*, 302 Md. 516, 489 A.2d 536 (1985); *Bankers & Shippers Ins. Co. v. Electro Enter.*, 287 Md. 641, 415 A.2d 278 (1980); *Cohen v. American Home Assur. Co.*, 255 Md. 334, 258 A.2d 225 (1969).

In *Cohen*, we held:

"American Home produced the current situation when it refused to defend its assured. Accordingly, whether one speaks in terms of its having authorized the expenditure by its failure to defend or whether one speaks in terms of the attorney's fees for the declaratory judgment action being a part of the damages sustained by the insured by American Home's wrongful breach of the contract, we hold American Home bound to pay the fees incurred by Mrs. Brown in bringing the declaratory judgment action to establish that American Home had not done that which it had agreed with her to do."

*Id.* at 363, 258 A.2d at 239.

In *Electro Enterprises,* we stated:

"With respect to similar policy provisions, this Court has held that an insurer is liable for the damages, including attorneys' fees, incurred by an insured as a result of the insurer's breach of its contractual obligation to defend the insured against a claim potentially within the policy's coverage, and this is so whether the attorneys' fees are incurred in defending against the underlying damage claim or in a declaratory judgment action to determine coverage and a duty to defend.... Furthermore, the right of an insured to recover attorneys' fees in such a situation applies not only to the named insured of the policy but also to any person who is within the policy definition of an insured and against whom a claim alleging a loss within the policy coverage has been filed."

*Id.* at 648–49, 415 A.2d 282–83 (citations omitted).

In *Continental Casualty,* we concluded:

"[T]his Court has sustained the award of counsel fees incurred by an insured in litigation with an insurer where the issue was whether the insurer was obligated to defend the insured against a claim asserted by a third party and where the insurer unsuccessfully maintained that it was not so obliged."

*Id.,* 302 Md. at 537, 489 A.2d at 547.

The Court of Special Appeals acknowledged that rule but, in *dicta,* suggested that it was not applicable, reasoning that U.S.F. & G. was justified in breaching its contract to provide coverage because the issue of whether Nolt was a permissive user of the truck he had leased to Summers was a "very close question for determination by the fact finder." *Id.* 90 Md.App. at 349, 600 A.2d at 1189. The intermediate appellate court found it unnecessary to reach that issue since it held that U.S.F. & G.'s obligations as an excess carrier were never triggered.

U.S.F. & G. breached its contract with Nolt when it denied him coverage under the policy it had issued to Summers. The fact that the breach was determined by a jury's finding of what Summers had said to Nolt on the day

**68**

prior to the accident is of no moment. The attorneys fees and expenses which Nolt incurred in connection with this litigation were the direct result of the breach of contract by U.S.F. & G. On remand, the trial court will assess those damages and include all attorney fees and expenses incurred by Nolt in connection with the previous proceedings in the circuit court, with those on remand, and with the proceedings in the Court of Special Appeals and in this Court.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE DECLARATORY JUDGMENT OF THE CIRCUIT COURT FOR CECIL COUNTY AND TO REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THAT DECLARATORY JUDGMENT.

COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY UNITED STATES FIDELITY AND GUARANTY COMPANY.