AMERICAN ALTERNATIVE
INSURANCE COMPANY,
Plaintiff,

v.

SENTRY SELECT INSURANCE COMPANY, and Sparkle Transport, Inc. d/b/a Seven Hills Transport, Defendants.

No. 01–668–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 18, 2001.

---

Lynn M. Fitzpatrick, Franklin & Prokopik P.C., Herndon, VA, for Plaintiff.

John T. Husk, Law Office of Seaton & Husk, L.P., Vienna, VA, Edward Miller McClure, Brincefield Hartnett Maloof & Associates P.C., Alexandria, VA, Frank Austin Wright, Jr., Overby Hawkins Selz & Wright, Rustburg, VA, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This declaratory judgment action is a dispute between insurers over which of two insurance policies is primarily responsible for covering injuries and property damage arising from a one-vehicle tractor-trailer accident. At issue specifically is whether a federally mandated endorsement to an interstate motor carrier insurance policy requires that policy to provide primary coverage for an accident involving a vehicle not listed in the policy where, as here, a second policy exists that provides coverage for the accident and specifically lists the vehicle.

### I.

This action grows out of injuries sustained in a one-vehicle accident involving a tractor-trailer owned and driven by Comet Iles, III. On November 1, 2000, Iles was hauling a load of sweet potatoes from Louisiana to Ohio on a contract arranged by Seven Hills Transport (Seven Hills). The

trip was cut short in Boone County, Kentucky, when Iles's rig flipped on its side and slid off the road as Iles unsuccessfully attempted to negotiate a curve in the highway. Traveling with Iles that day were his wife and three children, including a son who was seriously injured in the accident. Iles's injured family members have filed as-yet-unresolved claims against Iles and Sparkle Transport, Inc. (Sparkle) for injuries they suffered in the accident.

Although Iles owned the tractor-trailer involved in the accident, the rig displayed the placards, the U.S. Department of Transportation number, and the motor carrier number of Sparkle. Sparkle and Seven Hills are owned by the same person, but purport to perform different functions. Seven Hills, as an authorized *freight broker*, appears to be in the business of arranging freight shipments, while Sparkle, as an authorized *motor carrier*, appears to be in the business of hauling freight across state lines.[1]

Iles was insured by plaintiff American Alternative Insurance Company (AAIC) under a Truckers Policy that provided $1 million of liability insurance for certain "covered autos." Iles's tractor and trailer were both specifically listed as "covered

autos" under the AAIC policy. Sparkle, in turn, was insured by defendant Sentry Select Insurance Company (Sentry). The Sentry policy also provided $1 million of liability insurance and limited its coverage to specified "covered autos," which listing did not include the tractor or trailer driven by Iles on the day of the accident. Both the AAIC policy and the Sentry policy were in force on the day of the accident. The Sentry policy, but not the AAIC policy, included an "Endorsement for Motor Carrier Policies of Insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980" (also known by its form number: MCS–90), which is an insurance policy endorsement required by federal law for motor carriers that transport goods in interstate commerce. *See* 49 U.S.C. §§ 13906(a)(1), 31139(b)(2), (e)(1); 49 C.F.R. § 387.15. The parties agree that the Sentry policy would not provide liability coverage for this accident absent the MCS–90 endorsement.

The parties' contentions frame the issue presented. AAIC, for its part, admits that its policy provides coverage for this accident, but contends that the coverage provided is excess over the limits of the Sentry policy because of the effect of the

---

1. The parties dispute the nature of the relationship between Seven Hills and Sparkle and the nature of the hauling agreement between Iles and Seven Hills. Plaintiff American Alternative Insurance Company (AAIC) asserts that Seven Hills and Sparkle were effectively operating as one entity (thus explaining the caption of the case, in which Sparkle Transport, Inc. d/b/a Seven Hills Transport was named as a single defendant) and that Iles had an oral lease agreement with Sparkle to operate under Sparkle's motor carrier authority. AAIC further asserts that the alleged oral lease should be construed to conform with the federal requirements for written leases for motor carriers as set out by 49 C.F.R. § 376.11–12. Defendants disagree, contending that Iles's only agreement at the time of the accident was with Seven Hills as a broker,

not Sparkle as a motor carrier, and that Iles had no permission to display Sparkle's placards and numbers at the time of the accident. Defendants further contend that, even assuming Iles was operating under Sparkle's motor carrier authority at the time of the accident, Sparkle and Iles had in place an indemnification agreement whereby Iles must reimburse Sparkle for any loss it suffers as a result of Iles's actions.

The existence of a contractual indemnification agreement and the determination whether Iles had permission to operate under Sparkle's motor carrier authority are disputed questions not now ripe for disposition. Yet, a resolution of those disputed questions is not necessary to disposition of the cross-motions for summary judgment as they are immaterial to the issue presented here.

MCS–90 endorsement. Sentry, by contrast, contends that its policy provides no coverage at all, despite the MCS–90 endorsement. To resolve this coverage dispute, AAIC brought this action for declaratory judgment seeking a determination that, despite the tractor and trailer not being listed as "covered autos" on the Sentry policy, (i) the MCS–90 endorsement operates to require the Sentry policy to provide primary coverage for the damage that resulted from Iles's accident and (ii) the AAIC policy would, at most, provide only excess insurance over the $1 million limit of the Sentry policy.

The dispute in this case, then, concerns responsibility for the first $1 million of insurance coverage.[2] And, the question presented by the parties' cross-motions for summary judgment is whether the MCS–90 endorsement included in the Sentry policy requires Sentry to provide $1 million of primary coverage for the accident notwithstanding that the tractor and trailer are not listed vehicles in the policy and notwithstanding the existence of coverage by the AAIC policy, which does list the tractor and trailer.

**2.** *See infra* note 17.

**3.** *Compare Magann Equip. Inc. v. Buffkin,* 238 Va. 712, 385 S.E.2d 619 (1989) (holding that the MCS–90 makes the underlying policy primary, even in an allocation dispute among insurers) *with T.H.E. Ins. Co. v. Larsen Intermodal Servs.,* 242 F.3d 667 (5th Cir.2001) (finding that the MCS–90 endorsement does not affect allocation among insurers); *John Deere Ins. Co. v. Nueva,* 229 F.3d 853, 858 (9th Cir.2000) (same); *Empire Fire and Marine Ins. Co. v. J. Transport, Inc.,* 880 F.2d 1291 (11th Cir.1989) (same); *Occidental Fire & Cas. Co. of N.C. v. Int'l Ins. Co.,* 804 F.2d 983 (7th Cir.1986); *Grinnell Mut. Reinsurance Co. v. Empire Fire & Marine Ins. Co.,* 722 F.2d 1400 (8th Cir.1983); *Carolina Cas. Ins. Co. v. Ins. Co. of N. Am.,* 595 F.2d 128 (3d Cir.1979) (same); *Old Republic Ins. Co. v. Canal Ins. Co.,* 876 F.Supp. 80 (D.Md.1994)

## II.

◼ The threshold question in this case is one of governing law: Is the construction of the MCS–90 endorsement contained in the Sentry policy governed by federal law or state law? This threshold question is particularly important here because the Supreme Court of Virginia has adopted an interpretation of the MCS–90 endorsement that conflicts with the interpretation adopted by other federal district courts in this circuit and with the majority of federal circuit courts[3] that have considered the issue. On one hand, were state law to govern, the Supreme Court of Virginia's interpretation would control and the analysis here would end with the application of that court's interpretation of the MCS–90 endorsement to the facts of this case. On the other hand, if the interpretation of the MCS–90 endorsement is a matter of federal law, then the Supreme Court of Virginia's ruling is not controlling and, in the absence of federal controlling authority, the task here is to construe the MCS–90 endorsement as a matter of federal law in accordance with settled principles of construction. AAIC argues that the effect of the MCS–90 endorsement on the underly-

(same); *Carolina Cas. Ins. Co. v. Transport Indem. Co.,* 533 F.Supp. 22 (D.S.C.1981), *aff'd,* 676 F.2d 690 (4th Cir.1982) (same). *See also Canal Ins. Co. v. Carolina Cas. Ins. Co.,* 59 F.3d 281 (1st Cir.1995) (finding that the MCS–90 endorsement is in effect a suretyship, but is not insurance that relieves any other insurer of its obligations under its policy). *But see Empire Fire and Marine Ins. Co. v. Guaranty Nat'l Ins. Co.,* 868 F.2d 357 (10th Cir.1989) (finding that the endorsement does affect allocation among insurers, making the policy with the endorsement co-primary with policies that are primary by their own terms); *Integral Ins. Co. v. Lawrence Fulbright Trucking, Inc.,* 930 F.2d 258 (2d Cir.1991) (finding that an insurance policy with the federal endorsement obliges the insurer to indemnify, even where the judgment is based on a theory of vicarious liability).

**554**

ing insurance contract, which was entered into in Virginia,[4] should be governed by Virginia law because the dispute concerns the effect of an MCS–90 endorsement that is attached to a Virginia insurance contract. Sentry, in turn, argues that the effect of the MCS–90 endorsement is a question of federal law regardless of what law governs the underlying insurance contract and that the Supreme Court of Virginia's interpretation of the MCS–90 endorsement is neither correct nor binding.

■ It is, of course, settled that a diversity coverage dispute is typically governed by state law—in this case Virginia law, because the Sentry policy was made or entered into in Virginia.[5] Yet, as well-reasoned cases reflect, federal law must govern where, as here, the dispute concerns the interpretation of an insurance policy endorsement that is required by federal law and whose language is prescribed by a federal regulation.[6] This conclusion follows from the settled principle that "the meaning of words in a federal statute is a question of federal law." *Western Air Lines, Inc. v. Board of Equal-* *ization of State of S.D.*, 480 U.S. 123, 129, 107 S.Ct. 1038, 94 L.Ed.2d 112 (1987). And indeed, were this not so, the anomalous result would be the prospect of conflicting state constructions of a federal statute that was enacted by Congress to serve as a uniform solution to a national problem affecting interstate commerce.

### III.

■ The next, and determinative, question in this case, then, is the meaning and effect of the MCS–90 endorsement, addressed as a question of federal law. Well-settled principles govern this inquiry. The language of the MCS–90 is contained in a federal regulation adopted pursuant to statutory authority and, as such, has the force of law. The interpretive analysis properly begins with the plain meaning of the regulation's language. *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). If the language is clear and unambiguous, the inquiry ends there.[7] Yet, where the

4. The parties agree that the Sentry insurance contract was entered into in Virginia.

5. *See Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (applying choice-of-law rules of the forum state to issues governed by state law); *Lexie v. State Farm Mut. Auto. Ins. Co.*, 251 Va. 390, 469 S.E.2d 61 (1996) (finding that generally, the nature, validity, and interpretation of automobile insurance policies, like other contracts, are governed by law of place where made).

6. *See, e.g., John Deere Ins. Co. v. Nueva*, 229 F.3d 853, 856 (9th Cir.2000) (holding that "[f]ederal law applies to the operation and effect of [federally] mandated endorsements," including the MCS–90); *Carter v. Vangilder*, 803 F.2d 189, 191 (5th Cir.1986) (finding that the MCS–90 endorsement "is governed by federal, not state law"); *Carolina Cas. Ins. Co. v. Ins. Co. of N. Am.*, 595 F.2d 128, 135–39 (3d Cir.1979) (discussing the predecessor to the MCS–90 endorsement in the context of

the effect of federal law on an insurance dispute). *See generally Harter v. Vernon*, 101 F.3d 334, 342 (4th Cir.1996) ("Our holdings on questions of state law do not bind state courts, nor do state court determinations on questions of federal law control us.").

Indeed, no case reaches the contrary result. The Supreme Court of Virginia, in its sole decision addressing the effect of the MCS–90 endorsement, did *not* hold, as AAIC argues, that the endorsement should be interpreted according to state law because it had become part of an insurance contract governed by state law. Instead, the Supreme Court of Virginia presumably based its holding on an interpretation of federal law because it cited exclusively to federal decisions construing the MCS–90 endorsement. *See Magann*, 385 S.E.2d 619.

7. The meaning of the regulation's language must be interpreted in its statutory context. If the contextual plain meaning is unambiguous, the interpretive task is complete, as the

language is ambiguous, the intent of Congress or the Agency concerning the disputed language must be resolved through application of various settled rules of construction and interpretation, including analysis of the underlying statute's structure and purpose. *See United States v. Jackson,* 759 F.2d 342, 344 (4th Cir.1985); *Johnson v. Garraghty,* 57 F.Supp.2d 321, 326 (E.D.Va.1999).

■■■ To begin with, it is important to note that neither the MCS–90 endorsement nor the related parent regulations and statute specifically mention the question of coverage priority or allocation in circumstances where two or more policies may apply. This was not the issue that the MCS–90 endorsement and related provisions were adopted or promulgated to address. Still, the endorsement's language is plainly infected with ambiguity in this regard, as it arguably admits of two conflicting interpretations on this point:[8] (i) that an insurance policy with an MCS–90 endorsement is amended by the endorsement in all circumstances to provide primary coverage to compensate injured third parties, or (ii) that such a policy is only effectively amended to provide coverage in those circumstances where an injured third party would otherwise go uncompensated. These conflicting interpretations arise because the effect of the MCS–90 endorsement on the underlying policy is clearly affected by *who* is seeking to benefit from its application. On one hand, the MCS–90 clearly states that it amends the underlying policy to ensure compliance with the federal "Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration." 49 C.F.R. § 387.15.[9] It goes on to declare that the insurer must pay "regardless of whether or not each motor vehicle is specifically described in the policy" and that "no condition, provision, stipulation, or limitation contained in the policy, this en-

statute must then be applied in accordance with its plain meaning. *See Smith v. United States,* 508 U.S. 223, 229, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993); *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990); *Rubin v. United States,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); *Patten v. United States,* 116 F.3d 1029, 1035 (4th Cir. 1997).

8. A statute may reasonably be said to be ambiguous when its terms give rise to more than one meaning or interpretation. *See United States v. Murphy,* 35 F.3d 143, 145 (4th Cir. 1994).

9. The MCS–90, in pertinent part, states:

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility require-

ments of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy .,... It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.
49 C.F.R. § 387.15 (emphasis added).

dorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment." *Id.* The effect of this language is to "make[ ] the insurer liable to third parties for any liability resulting from the negligent use of any motor vehicle by the insured, even if the vehicle is not covered under the insurance policy." *T.H.E. Ins. Co. v. Larsen Intermodal Servs.*, 242 F.3d 667 (5th Cir.2001). Thus, if the person invoking the provisions of the MCS–90 is an injured member of the public, the policy is amended. Yet, on the other hand, the MCS–90 endorsement explicitly states that the endorsement does not alter the insurance contract as between the insured and the insurer, and it obligates the insured to reimburse the insurer for any payments the insurer would not have been liable to make under the policy but for the terms of the endorsement. *See* 49 C.F.R. § 387.15.[10] This reimbursement

provision operates, at least theoretically, to place insured and insurer in the same relative legal positions they would have occupied in the absence of the MCS–90 endorsement—that is, the *insured* bears the burden of a loss that is not covered under the policy.[11] Because the endorsement's effect on the underlying insurance contract depends by its own terms on *who* is involved in the dispute, the question regarding allocation of responsibility among insurers could reasonably be answered in one of two ways, depending on whether the question more closely resembles a duty to the public, where the MCS–90 endorsement clearly applies to alter the policy, or the contract between the insurer and insured, where the endorsement has no effect.

The key to resolving the ambiguity in the MCS–90 endorsement is to be found in the purpose of the statute and regulations that require the endorsement. The pertinent statute states that the Secretary of

**10.** In this respect, the guarantee of financial responsibility that the MCS–90 provides to the public is not traditional insurance at all because an insurer typically has no right of indemnity against its insured for payments made under a contract of insurance. *See Sherwood Trucking, Inc. v. Carolina Casualty Ins. Co.*, 552 F.2d 568, 572 (4th Cir.1977).

**11.** This MCS–90 reimbursement provision functions to create a "circle of indemnity," such that an insurer whose policy would, by its own terms, provide coverage for an accident (without considering the effects of the MCS–90 endorsement on any other policy that might be implicated) would ultimately bear responsibility for any loss up to the limits of its policy. This circle may be illustrated by the following example: Lessor owns a truck and leases it to Lessee. Lessor is hired to drive the truck for Lessee. Lessor is negligent and causes an accident that injures Public. Lessor has insurance that would cover the accident; Lessee has insurance that would not otherwise provide coverage, but to which an MCS–90 endorsement is attached. Public obtains a judgment against Lessor and

Lessee. Lessee's insurer satisfies the judgment. Lessee's insurer seeks indemnification from Lessee under the MCS–90 provision that allows such indemnification where the policy would not have provided coverage but for the MCS–90. Lessee then seeks indemnification from Lessor (under either contractual or common-law theories as recognized by Virginia law, *see Philip Morris, Inc. v. Emerson*, 235 Va. 380, 368 S.E.2d 268, 285 (1988) (suggesting that where a party's liability is vicarious—so-called "passive negligence"—that party may seek indemnification from another party whose negligence actually caused the injury, that is, the party who was "actively" negligent)). The result is that Lessor's insurer is ultimately responsible for satisfying the judgment because Lessor is ultimately responsible for the injury and Lessor's insurer is liable for Lessor's negligence. *See* 15 Lee R. Russ et al., *Couch on Insurance* § 217:16 (3d ed. Supp.2000) (explaining indemnification in the insurance context). This "circle of indemnity" may be closed by holding the Lessor's insurer responsible in the first place, thus obviating the need for expensive legal battles over responsibility.

Transportation is authorized to require motor carriers to file proof of financial responsibility to "protect the public." *See* 49 U.S.C. § 13906(a)(2).[12] Consistent with this, the United States Supreme Court has cited as "significant aims" of the federal rules regulating motor carriers the elimination of "difficulties . . . of fixing financial responsibility for damage and injuries . . . to *members of the public." Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.,* 423 U.S. 28, 37, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975) (emphasis added). Further, the Supreme Court found that this responsibility to the public does not void otherwise-valid private agreements. Specifically, in *Transamerican,* the Supreme Court held that an indemnification agreement between the lessor and lessee of a vehicle that shifted liability to the lessor did not transgress the federal regulations requiring the lessee to be ultimately responsible for the operation of the vehicle. *Id.* at 40, 96 S.Ct. 229. It reached this conclusion on the ground that as long as one of the responsible parties pays for the damages, the public is protected and the regulations are not violated. *Id.* Thus, *Transamerican* teaches that the

purpose of federal regulation of motor carriers is to ensure the safety of the public, and the promulgated regulations do not reach further than necessary to achieve that purpose.

This reasoning, when applied to the ambiguity in the MCS–90 endorsement concerning the allocation of loss between insurers, leads to the conclusion that the contractual duties of insurers to provide coverage for a loss should not be altered unless necessary to protect the public. Indeed, there is a presumption against federal laws and regulations unnecessarily intruding into the realm of traditional state responsibilities such as the regulation of insurance.[13] Consistent with this presumption and with the purpose of the endorsement's parent federal legislation, the MCS–90 endorsement should be construed and applied only to protect members of the public injured by interstate motor carriers from *uncompensated* losses—by mandating coverage where there would otherwise be no coverage. Where there is other adequate coverage, this purpose is not implicated and the MCS–90 endorsement should not operate to amend a policy.[14] Precisely this result has been reached by a majority of the circuits that have squarely addressed this issue.[15] Indeed, the Third

---

12. The other statutory provision granting the Secretary of Transportation authority to set minimum levels of financial responsibility for transporting property in interstate commerce is concerned with "public liability, property damage, and environmental restoration." 49 U.S.C. § 31139(b)(1). Indeed, the MCS–90 itself is entitled "Endorsement for Motor Carrier Policies of Insurance for *Public Liability,*" where "Public Liability" is defined to mean "bodily injury, property damage, and environmental restoration." 49 C.F.R. § 387.15 (emphasis added).

13. *See, e.g., Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 518, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (finding that statutes, when ambiguous, should be interpreted on the assumption that Congress intended to preserve local authority).

14. A contrary conclusion would lead to the anomalous result of the "circle of indemnity." *See supra* note 11.

15. *See T.H.E. Ins. Co. v. Larsen Intermodal Servs.,* 242 F.3d 667 (5th Cir.2001) (finding that the MCS–90 endorsement does not affect allocation among insurers); *John Deere Ins. Co. v. Nueva,* 229 F.3d 853, 858 (9th Cir.2000) (same); *Empire Fire and Marine Ins. Co. v. J. Transport, Inc.,* 880 F.2d 1291 (11th Cir.1989) (same); *Occidental Fire & Cas. Co. of N.C. v. Int'l Ins. Co.,* 804 F.2d 983 (7th Cir.1986); *Grinnell Mut. Reinsurance Co. v. Empire Fire & Marine Ins. Co.,* 722 F.2d 1400 (8th Cir. 1983); *Carolina Cas. Ins. Co. v. Ins. Co. of N. Am.,* 595 F.2d 128 (3d Cir.1979) (same).

In reaching a contrary result, the Supreme Court of Virginia concluded that the MCS–90 endorsement was not ambiguous by reference to that portion of the endorsement where an

Circuit characterized the contrary result as a "massive ... disruption of the tissue of state law [that] would be extraordinary in the American legal framework." *Carolina Cas. Ins. Co. v. Ins. Co. of N. Am.,* 595 F.2d 128, 138 n. 31 (3d Cir.1979). The majority of circuits recognize that the sounder approach is to construe the MCS–90 endorsement as not altering a policy to require primary coverage where another policy specifically provides coverage. The Seventh Circuit succinctly summed up this principle as follows:

> The purpose of the federal statute and regulations is to ensure that a [federally licensed motor] carrier has independent financial responsibility to pay for losses sustained by the general public arising out of its trucking operations. However, once it is clear that there are sufficient funds available to safeguard the public, the inquiry changes: '[t]he pertinent question is whether the federal policy of assuring compensation for loss to the public prevents courts from examining the manner in which private agreements or state laws would otherwise allocate the ultimate financial burden of the injury.' [16]

This principle compels the conclusion that the AAIC policy is primary because it is the only policy that specifically provides coverage by its own terms.[17] Were the Sentry policy the only available coverage, then Sentry could not escape the significant duty of financial responsibility to the public that is imposed by the MCS–90 endorsement. But, given the coverage provided here by the AAIC policy, the MCS–90 endorsement in the Sentry policy does not operate to amend that policy to cause it to provide coverage for the first $1 million of loss. That responsibility belongs to AAIC.[18]

An appropriate Order has issued.

---

insurer may check a box to indicate whether the underlying policy provides "primary" or "excess" coverage. That analysis misses the point: The central ambiguity in the MCS–90 endorsement concerns whether the endorsement amends the underlying policy *at all* to cause it to provide coverage for a given accident. Only then is the question of coordination with other policies implicated. The indication in the MCS–90 endorsement whether the underlying policy provides primary or excess coverage relates to where the underlying policy stands in the tiers of coverage for the named insured, but does not speak to coordination of coverage among multiple policies that may be implicated in a dispute.

**16.** *Travelers Ins. Co. v. Transport Ins. Co.,* 787 F.2d 1133, 1140 (7th Cir.1986) (quoting *Carolina Cas. Ins. Co.,* 595 F.2d at 138). The

Seventh Circuit then concluded that the federal policy does *not* preclude the operation of otherwise valid private agreements or state laws. *See id.*

**17.** The federal regulations "are not so radically intrusive as to absolve lessors or their insurers of otherwise existing obligations ... under contracts allocating financial risk among private parties." *Carolina Cas. Ins. Co.,* 595 F.2d at 138.

**18.** Because the underlying personal injury claims have not been resolved, it is not yet known whether the damages from the accident exceed the $1 million limit of the AAIC policy. Thus, the question of coverage for losses over $1 million is neither presented nor decided.