Deborah SEIDEL, Andre Sassoon, and
Daniel Berringer, Plaintiffs,

v.

HOUSTON CASUALTY COMPANY,
Defendant.

No. 04 Civ. 3612(GEL).

United States District Court,
S.D. New York.

March 7, 2005.

Sheldon H. Elsen, Ashley U. Menendez, Orans, Elsen & Lupert LLP, New York, NY, for Plaintiffs, of counsel.

Wallace A. Christensen, Carmen R. Kelley, Prashant K. Khetan, Ross, Dixon & Bell L.L.P., Washington, DC, for Defendant, of counsel.

## OPINION AND ORDER

LYNCH, District Judge.

In this action on an insurance contract, plaintiffs, the president, chief financial officer, and chairman of Sloan's Auction Galleries, Ltd. ("Sloan's"), successfully defended a suit brought by an unpaid consignor, and sought payment for their defense costs under a directors and officers ("D & O") liability insurance policy purchased from defendant Houston Casualty Company ("Houston"). After paying $65,560 to the plaintiffs for defense costs, defendant refused further coverage, relying on the policy's "Errors and Omissions Exclusion (with Management Carveback)." Consequently, plaintiffs brought this suit against Houston for breach of contract and a declaratory judgment that Houston is liable for defense costs incurred (and any future payments) in the underlying suit. Plaintiffs move for partial summary judgment as to liability; defendant cross-moves for the same, and also seeks recovery of the 565,560 "that it mistakenly paid for [plaintiffs'] defense costs." (D.Mem.2.) Plaintiffs' motion will be granted; defendant's motion will be denied.

## BACKGROUND

The relevant facts are essentially undisputed.[1] Plaintiffs Deborah Seidel, Daniel Berringer, and Andre Sassoon, were respectively the president. CFO, and chairman of Sloan's, a Maryland auction house. Sloan's had purchased a D & O liability insurance policy—entitled "Directors, Officers and Private Organization Liability Insurance Policy" ("Policy") (Elsen Aff. Ex. 1)—from defendant Houston.[2] In December 2002, Sloan's filed for Chapter 11 bankruptcy. (Compl. ¶¶ 10–11.)[3]

### I. *The Underlying Lawsuit*

In January 2002, Frederick Martin entered into a consignment contract with Sloan's to auction his inventory of antiques.[4] (Martin Compl., Elsen Aff. Ex. 2; D.R. 56.1 Counterstmt No. 12.) On February 21, 2002, Sloan's auctioned 760 Martin's antiques, at prices below Martin's expectations. (Martin Third Am. Compl., Elsen Aff. Ex. 5, ¶¶ 43–44.) Martin demanded that Sloan's auction no more of his goods and that Sloan's forward to him the gross proceeds of the auction's completed sales. (*Id.* ¶¶ 44–46.) Although Sloan's did not pay the $66,338 it owed Martin, Sloan's eventually tendered a partial payment of $2000, which Martin refused. (*Id.* ¶¶ 45–50.)

On July 22, 2002, Martin filed a lawsuit in Maryland state court against Sloan's, Seidel, and Berringer, alleging that Sloan's had violated various provisions of the contract and that plaintiffs had misused the proceeds of auction sales to pay corporate operating expenses rather than consignors like himself. (Martin Compl.; Martin First Am. Compl., Elsen Aff. Ex. 3; Martin Second Am. Compl., Elsen Aff. Ex. 4; Martin Third Am. Compl.) Martin brought claims against Sloan's for breach of contract;[5] and against Seidel and Ber-

---

1. In accord with Local Rule 56.1, unless otherwise indicated, the facts presented here are those admitted by Houston—either expressly or by its failure to controvert plaintiffs' statement with a counterstatement supported by the record—in its response to plaintiffs' Local Rule 56.1 Statement in support of its summary judgment motion. Although Houston cross-moves for summary judgment, Houston failed to submit its own Local Rule 56.1 statement of material facts as to which there is no genuine issue to be tried, but filed a counterstatement to plaintiffs' Local 56.1 statement. As these motions were filed before discovery, the record is composed entirely of the insurance policy, correspondence between the parties and other documents in connection to the Martin lawsuit, and a declaration by an underwriting manager at Houston.

2. HCC Global Financial Products, LLC, formerly MAG Global Financial Products LLC, acted as Houston's claims administrator during all transactions relevant to this action. (Compl. ¶¶ 4–5; Answer ¶¶ 4–5.) In the interest of simplicity, and as there is no issue as to the agency relationship between MAG or HCC Global and Houston, the Court will refer to the three interchangeably as "Houston."

Similarly, the Court refers generically to the three plaintiffs' various lawyers as "plaintiffs' counsel."

3. Unless otherwise indicated, the Court's references to Martin's "complaint" refer to his third amended complaint.

4. Martin kept his inventory in South Carolina, and Sloan's representatives traveled to South Carolina to transact with Martin. (Martin. Am. Compl. ¶ 12; Martin Third Am. Comp. ¶ 22.) The antiques were picked up from South Carolina by Sloan's and presumably auctioned at a Sloan's facility in Maryland. (Martin Compl. ¶ 24; Martin. Am. Compl. ¶ 13.) Although none of the papers submitted in connection with this motion appear to document that the auction took place in Maryland, it is undisputed that Sloan's principal place of business is in Maryland. (*See* Compl. ¶ 1; Answer ¶ 1; and the address given for Sloan's on the cover page of the Policy itself.)

5. In addition to its failure to pay the auction proceeds, Martin also complained that contrary to what it promised him, Sloan's had held the auction on a weekday, rather than on

ringer, among others, for breach of fiduciary duty, constructive fraud, conversion, deceit/fraud, racketeering, and conspiracy to defraud. Martin alleged that when Sloan's contracted with him, plaintiffs were aware that, despite Sloan's delinquency in paying its consignors, Sloan's agents represented to Martin that Sloan's would forward the auction's proceeds to him within thirty-five days of the sale. According to the third amended complaint, "Sloan's annual revenues were insufficient to simultaneously: (a) meet its operating expenses; and (b) pay in a timely manner, if at all, consignors the net proceeds of auction sales to which they were entitled." Instead, "[d]espite [Martin's] repeated demands . . . . proceeds due to [Martin] were converted and used to pay other consignors, as well as the salaries of the employees at Sloan's, including [Seidel and Berringer]." Martin amended his complaint on three occasions after plaintiffs (and other defendants) moved to dismiss, and, in his third (and final) amended complaint, added claims against Sassoon.[6]

Martin's lawsuit was dismissed pursuant to plaintiffs' summary judgment motions. On July 12, 2004, the Circuit Court for Montgomery County, Maryland, entered final judgment against Martin, and on the same day, Martin noticed an appeal.

## II. *The Insurance Policy*

The Policy, in relevant part, states that "[t]he insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made against them during the Policy Period or Discovery Period (if applicable) for Wrongful Acts."[7] The Policy defines "Insured Person" as "any past, present or future director, officer, managing member, manager or Employee of the Insured Organization." "Loss" is defined as "[d]efense [c]osts and any damages, settlements, judgments, back pay awards and front pay awards or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that an Insured is legally obligated to pay as a result of any Claim." A "claim" is defined, in relevant part, as "any civil proceeding commenced by service of a complaint or similar pleading." A "[w]rongful [a]ct" includes "(2) any other actual or alleged act, error, misstatement, misleading statement, omission or breach

a weekend, failed to research the value of his antiques and to provide to Martin a "receiving sheet" so that Martin could establish a reserve for each item (resulting in sales of the antiques for prices lower than their worth and his expectations), and failed to properly advertise the antiques.

6. With regard to the plaintiffs in this case, Martin alleged that Seidel "controlled the operation of Sloan's and disposition of proceeds of auction sales, including the proceeds due to [Martin]"; that Berringer "controlled the operation of Sloan's and the disposition of the auction sales"; that Sassoon was "responsible for the finances of Sloan's"; and that Berringer "prepared a financial analysis of Sloan's," which allegedly reflected the total overdue consignor payments and showed that "none of the proceeds from [Martin's] Febru-

ary 21, 2002 auction was to be used to pay [Martin], who was a consignor for that action." Martin further alleged that Seidel and Berringer owed duties to Martin "to ensure that Sloan's was fulfilling its fiduciary duties to [Martin]," and that Sassoon "had a duty to [Martin] to ensure that Sloan's fulfilled its obligation to [Martin] and pay the proceeds of the auction to him as a consignor." Moreover, all three plaintiffs are alleged to have "had control over Sloan's disposition of [Martin's] goods and [Martin's] money," and that "[a]s [Martin's] agent, Sloan's and [plaintiffs] had a duty to exercise reasonable care to promote and protect [Martin's] interests with respect to that sale of goods."

7. In quoting the Policy throughout this opinion, the Court has omitted all original emphasis.

of duty (a) by the Insured Organization, or (b) by an Insured Person in his or her capacity as a director, officer, member, manager or Employee of the Insured Organization or in an Outside Capacity; or (3) any matter claimed against an Insured Person solely by reason of his or her service (a) as a director, officer, member, manager or Employee of the Insured Organization, or (b) in an Outside Capacity."

Endorsement Number 2 to the Policy includes the "Errors and Omissions Exclusion (with Management Carveback)," which states:

(1) No coverage will be available under this Policy for Loss, including Defense Costs, from Claims for any actual or alleged act, error, omission, misstatement, misleading statement, or breach of duty in connection with the rendering of, or actual or alleged failure to render, any services for others for a fee or commission or on any other compensated basis by any person or entity otherwise entitled to coverage under this Policy.

(2) Paragraph (1) is not intended, however, nor shall it be construed, to apply to Loss, including Defense Costs, in connection with any Claim against an Insured Person who is a director or officer of the Insured Organization to the extent that such Claim is for a Wrongful Act by such Insured Person who is a director or officer of the Insured Organ-

ization in connection with the management or supervision of any division. Subsidiary or group of the Insured Organization offering any of the aforementioned services.

### III. *Plaintiffs' Request for, and Defendant's Denial of, Coverage*

On August 27, 2002, at the outset of Martin's lawsuit, plaintiffs sought payment of their defense costs for the Martin lawsuit under Houston's D & O policy. (D.R. 56.1 Counterstmt No. 16; Answer ¶ 32; *see* P. 56.1 Stmt No. 16.) Correspondence between plaintiffs' counsel and defendant followed.

On October 15, 2002, Jennifer L. MacLelland, a claims attorney for Houston,[8] provided plaintiffs with "preliminary coverage analysis," stating that the policy did not appear to cover plaintiffs' defense costs, while "reserv[ing] all rights and defenses available to it under the policy." (Letter from Jennifer L. MacLelland, to Gerald W. Heller, dated October 15, 2002, D. Opp'n Ex. A.) "In the first half of 2003," plaintiffs' counsel submitted to Houston various requests for payment and invoices. (P. Mem. 5; Compl. ¶ 32; Answer ¶ 32.) Although the record is unclear as to the events that led up to Houston's apparent (and temporary) change of heart with regard to the Policy's coverage of plaintiffs claim,[9] on May 7, 2003, plaintiffs' counsel

---

**8.** MacLelland worked as a claims counsel for MAG, and then HCC Global, which successively worked as Houston's claims administrator.

**9.** In fact, neither party provides the narrative for either of Houston's apparent changes of heart, from its preliminarily denial of coverage in its October 2002 letter, to its apparent approval of plaintiffs' counsel in April 2003 and payment to plaintiffs of $65,000 in fees in July 2003, to its resumption of its stance that the Policy did not cover plaintiffs' claim in its October 2003 letter. Plaintiffs' counsel's

April 5, 2004, letter to MacLelland provides a glimpse into the possible sequence of events:

You and your company had recognized that our fees were covered when it paid the first $65,000 in July of 2003. Shortly thereafter you told us on your company's behalf that you would rather pay defense legal fees in excess of [Martin's] claim in order to complete discovery and move for summary judgment, rather than pay to settle plaintiff Martin's case and risk attracting large numbers of other such dubious claims from consignors. Now you have achieved your

wrote to Houston, attaching an invoice for work performed in April 2003, confirming Houston's "approv[al] of this firm [and another lawyer], as discussed during this morning's telephone call." (Letter from Matthew D. Griffin to Jennifer L. MacLelland, dated May 7, 2003, Elsen Reply Aff. Ex 10.) On June 24, 2003, MacLelland e-mailed plaintiffs' counsel, confirming that she had "received and reviewed" plaintiffs' counsel's invoices, and requesting a litigation plan and budget. (E-mail from Jennifer L. MacLelland to Matthew D. Griffin, dated June 24, 2003, Elsen Reply Aff. Ex 11.) On June 27, 2003, plaintiffs' counsel provided Houston with the requested litigation plan and estimated budget. (Letter from Orans, Elsen & Lupert LLP to Jennifer L. MacLelland, dated June 27, 2003, Elsen Reply Aff. Ex. 12.) In July 2003, Houston reimbursed plaintiffs for $65,000. (P. 56.1 Stmt. No. 17; Letter from Sheldon H. Elsen to Jennifer L. MacLelland, dated April 5, 2004, Elsen Aff. Ex. 7, at 1; Compl. ¶ 34; Answer ¶ 34.) [10]

On September 23, 2003, plaintiffs' counsel sent Houston another invoice for its legal fees. (Compl. ¶ 45.) But in an October 9, 2003, letter, Evelyn Williams, acting on behalf of MacLelland, denied coverage under the Policy pursuant to the Errors and Omissions Exclusion. (Letter from Evelyn V. Williams to Sheldon H. Elsen, dated October 9, 2003, D. Opp'n Ex. B.) On

November 25, 2003, plaintiffs' counsel wrote to MacLelland contesting Houston's notice that it would deny coverage. (Compl. ¶ 51.) In the same month, plaintiffs' counsel called MacLelland to request that payment of plaintiffs' legal fees and disbursements be resumed, on an as-incurred basis, as the Policy required. (Id. ¶ 52.) In January and February, 2004, plaintiffs' counsel wrote to MacLelland on two occasions, arguing that the policy covered Martin's claims, and enclosed outstanding invoices. (Id. ¶¶ 53–54.) On March 24, 2004, MacLelland wrote to plaintiffs' counsel with coverage analysis updated in light of Martin's third amended complaint, stating that the policy did not cover plaintiffs' defense costs because "[t]he exception to the Errors and Omissions Exclusion does not apply because all of the allegations against the Individual Defendants are in connection with the transaction with Mr. Martin and not in connection with the Individual Defendants' management of any division or group within Sloan's." (Letter from Jennifer MacLelland to Sheldon H. Elsen, dated March 24, 2004, Elsen Aff. Ex. 6, at 3.) On April 5, 2004, plaintiffs' counsel again wrote MacLelland, contesting defendant's refusal to cover Seidel's costs, and demanding payment of a $127,862.81 bill. (Letter from Elsen to MacLelland, dated April 5, 2004.) [11]

---

strategy in full, for summary judgment has been granted as to defendant Sassoon and will be granted as to Seidel and probably to the other defendants. And just as your goals are achieved, your company seeks to disclaim coverage, leaving us to bear the risk of the strategy you chose, with our bills and subsequent services unpaid.
(Letter from Elsen to MacLelland, dated April 5, 2004.)

**10.** Houston now characterizes this payment as a "mistake[]." (D.Mem.3.)

**11.** Plaintiffs' counsel's June 27, 2003, letter indicated that "[w]e continue to believe this case should be settled as soon as possible to keep costs down." (Letter from Orans, Elsen & Lupert LLP to Jennifer L. MacLelland, dated June 27, 2003, at 3.) The case never settled, and some evidence suggests that defendant was responsible for plaintiffs' failure to settle the case: in its April 5, 2004, letter, plaintiffs' counsel suggests that Houston's refusal to cover plaintiffs' defense costs is audacious in light of Houston's previously expressed preference that plaintiffs not settle with Martin so as to avoid attracting other

On May 12, 2004, plaintiffs filed the instant suit for breach of contract and a declaratory judgment that Houston is liable for defense costs (and future payments) in the underlying suit, including costs incurred defending against Martin's appeal. Houston denied liability and raised various affirmative defenses based on the insurance policy's terms, including the Errors and Omissions exclusion provision, and the requirement that plaintiffs obtain Houston's consent to defense costs. Plaintiffs move for summary judgment as to liability; and defendant cross-moves for summary judgment, and seeks recovery of the $65,560 "that it mistakenly paid for [plaintiffs'] defense costs." (D.Mem.2.)

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56©. In turn, a "genuine issue as to any material fact" is established "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "It is the movant's burden to show that no genuine factual dispute exists, and all reasonable inferences must be drawn in the non-movant's favor." *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir.2003) (internal citations omitted); *see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). A summary judgment motion will be defeated with re-

spect to those claims that present such genuine issues of material fact. To defeat summary judgment, however, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

Here, both plaintiffs and defendant seek summary judgment as a matter of law based primarily on their respective interpretations of the Policy and the undisputed facts set forth above. In addition, defendant argues that there are genuine issues of material fact as to the parties' intent behind the Policy, as well as to the choice of law analysis.

### II. *Choice of Law*

#### A. Analysis

■ As the parties disagree about whether New York or Maryland law governs this dispute, the Court first addresses the choice-of-law question. In this diversity action, to determine which state's substantive law to apply, this Court must apply the choice-of-law rules of the forum state, New York. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

■ The first step in any case potentially presenting a choice-of-law question is to determine whether there is an actual conflict between the laws of the jurisdictions involved. *Maryland Cas. Co. v. Continental Cas. Co.*, 332 F.3d 145, 151 (2d

consignors' claims. (Letter from Elsen to MacLelland, dated April 5, 2004, at 1–2.) *See* *also supra* note 9.

Cir.2003) (quoting *In re Allstate Ins. Co. and Stolarz*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993)). Here, there is a conflict—as plaintiffs point out (P. Mem.17), Maryland law holds that "when an insured must resort to litigation to enforce its liability insurer's contractual duty to provide coverage for its potential liability to injured third persons, the insured is entitled to a recovery of the attorneys' fees and expenses incurred in that litigation," *see Nolt v. United States Fid. & Guar. Co.*, 329 Md. 52, 617 A.2d 578, 585 (1993), regardless of whether the policy at issue involves a duty to defend or a duty to pay for a loss, *Cont'l Cas. Co. v. Bd. of Educ.*, 302 Md. 516, 489 A.2d 536, 547 (1985). Conversely, as defendant points out (D.Mem.16), in New York "an insured may not recover the expenses incurred in bringing an affirmative action against an insurer to settle its rights under the policy." *West 56th St. Assocs. v. Greater New York Mut. Ins. Co.*, 250 A.D.2d 109, 681 N.Y.S.2d 523, 527 (N.Y.App.Div.1998) (internal quotation marks and citation omitted); *Can–Am Roofing, Inc. v. Am. States Ins. Co.*, 229 A.D.2d 973, 645 N.Y.S.2d 253, 255 (N.Y.App.Div.1996).[12] As there is an actual conflict between Maryland and New York law, the Court must decide which state's laws properly apply.[13]

12. In a December 21, 2004, letter, plaintiffs pointed this Court to a recent New York Court of Appeals case, *U.S. Underwriters Ins. Co. v. City Club Hotel LLC*, 3 N.Y.3d 592, 789 N.Y.S.2d 470, 822 N.E.2d 777 (2004), and a related Second Circuit Court of Appeals case which certified the case to the New York Court of Appeals, 369 F.3d 102 (2d Cir.2004), which may throw some confusion into what seems to be otherwise clear New York law. (Letter of Sheldon H. Elsen to the Court, dated December 21, 2004.) In *U.S. Underwriters*, the New York Court of Appeals held that "an insured who prevails in an action brought by an insurer seeking a declaratory judgment that it has no duty to defend or indemnify the insured, may recover attorneys' fees expended in defending against the declaratory judgment action regardless of whether the insurer provided a defense to the insured." *Id.*, 3 N.Y.3d 592, 593, 789 N.Y.S.2d 470, 822 N.E.2d 777, 778. Although Houston did not initiate the current action, and thus the facts here do not fall precisely within the New York Court of Appeals holding, the Second Circuit in certifying the same case stated in a footnote "that it is *possible* that the insurer would still be held liable for any attorneys' fees accrued as a result of the insurer's cross-claim for summary judgment." 369 F.3d at 111 (citing *U.S. Underwriters Ins. Co. v. Weatherization, Inc.*, 21 F.Supp.2d 318, 328 (S.D.N.Y.1998)) (emphasis added). Because the insurer's obligation to pay the insured who resorts to litigation to enforce the insurer's contractual duty to provide coverage for its potential liability to third persons is certain under Maryland law, and speculative at best under New York law, there is still a conflict between Maryland and New York law as to this lawsuit.

13. The conflict between Maryland and New York law that the parties point to relates solely to plaintiffs' ability to recover legal fees for this lawsuit, which is a claim distinct from plaintiffs' breach of contract claim. Thus, this Court could arguably invoke the doctrine of depeçage, the choice-of-law doctrine which allows this Court to apply the law of different states to distinct issues, here (1) liability under the Policy for plaintiffs' costs in connection to the Martin litigation, and (2) plaintiffs' ability to recover fees for this lawsuit. *See Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 397 n. 1 (2d Cir.2001) (depeçage recognized in New York); *Don King Prods., Inc. v. Douglas*, 742 F.Supp. 741, 772 (S.D.N.Y. 1990). But, here, as the contract is unambiguous, and Maryland law and New York law are similar in all relevant aspects with regard to insurance contract interpretation—i.e., both focus on the plain language of the contract from the perspective of a reasonable layperson, aim to effectuate the intent of the parties, and allow courts to determine whether a contract is ambiguous as a matter of law, *see Brunetto v. Mass. Mut. Life Ins. Co.*, 200 F.Supp.2d 380, 382 (S.D.N.Y.2002); *Sallie v. Tax Sale Investors, Inc.*, 149 Md.App. 141, 814 A.2d 572, 577–78 (2002); *see also Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 616–17 (2d Cir.2001); *Mostow v. State Farm Ins. Cos.*, 88 N.Y.2d 321, 326, 645

■ In contract disputes. New York courts apply the "center of gravity" or "grouping of contacts" theory of conflict of laws, which requires the courts to apply "the law of the place which has the most significant contacts with the matter in dispute." *Maryland Cas. Co.*, 332 F.3d at 151 (citing *Auten v. Auten.* 308 N.Y. 155, 160, 124 N.E.2d 99 (1954) (internal quotation marks omitted)); *see U.B. Vehicle Leasing Inc. v. Atlantic Mut. Ins. Co.*, No. 00 Civ. 9266, 2004 WL 503729, at *5 (S.D.N.Y. Mach 12, 2004). "In cases involving insurance contracts, New York courts have looked principally to the following factors: [1] the location of the insured risk; [2] the insured's principal place of business; [3] where the policy was issued and delivered; [4] the location of the broker or agent placing the policy; [5] where the premiums were paid; and [6] the insurer's place of business." *Olin Corp. v. Ins. Co. of N. America*, 743 F.Supp. 1044, 1048–49 (S.D.N.Y.1990), *aff'd*, 929 F.2d 62 (2d Cir.1991); *Am. Nat'l Fire Ins. Co. v. Mirasco. Inc.*, 143 F.Supp.2d 372, 378–79 (S.D.N.Y.2001) (important factors to be considered when deciding which state's laws to apply in insurance contract dispute "include the location of the insured risk, residence of the parties and where the contract was issued and negotiated" (internal citations and quotation marks omitted)); *see Wiener v. Unumprovident Corp.*, No. 00 Civ. 9315, 2002 WL 31108182, at *2 (S.D.N.Y. Sept.20, 2002) (collecting cases).

■ Most important in the context of insurance contracts is "the local law of the state which the parties understood was to be the principal location of the insured risk ... unless with respect to the particu-

lar issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties." *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 318, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994) (quoting Restatement (Second) of Conflict of Laws § 6 (1971) (internal quotation marks omitted, ellipses in original)). *See also Philadelphia Indem. Ins. Co. v. Employers Ins. Co. of Wausau*, 318 F.Supp.2d 170, 172 (S.D.N.Y.2004) ("In the context of that special subset of contracts that involves insurance, New York law calls for application of the local law of the state which the parties understood was to be the principal location of the insured risk."); *In re Payroll Express Corp.*, 921 F.Supp. 1121, 1125 (S.D.N.Y.1996); *see also Globalnet Fin. Com. v. Frank Crystal & Co.*, No. 03 Civ. 733, 2004 WL 1632594, at *3 (S.D.N.Y. July 22, 2004) ("Where the insured's interests include a 'wide geographical range,' New York courts have applied the law of the state where the policies were executed, issued and brokered, and where the insured had their principal place of business.").

## B. Application

In light of the Policy's coverage, the insured risk was in Maryland. Sloan's management decisionmaking took place in Maryland and, therefore, any alleged wrongful acts in connection with the management of Sloan's likely took place in Maryland. *See Am. Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.*, No. 94 Civ. 2727, 1997 WL 906427, at *6 (S.D.N.Y. Sept.12, 1997); *Steadfast v. Sentinel*, 283 A.D.2d 44, 727 N.Y.S.2d 393, 398 (1st Dep't

N.Y.S.2d 421, 668 N.E.2d 392 (1996); *Callaway v. MAMSI Life & Health Ins. Co.*, 145 Md.App. 567, 806 A.2d 274, 282 (Md.2002)— the point is moot, and the Court need not determine whether the interests at stake are

sufficiently distinct as to justify the application of New York law for one claim and Maryland law for the other. Moreover, neither party suggests that the Court invoke depeçage.

2001). Sloan's principal place of business was in Maryland. (Answer ¶ 1; Compl. ¶ 1; P. Reply. Mem. 7.) The Policy was issued in Farmington, Connecticut, and delivered to Sloan in Maryland. (P. Reply Mem. 8; Policy, Ex. 1 p. 1.) Houston's principal place of business is in Texas, and is also licensed to do business in New York. (Answer ¶ 4; Compl. ¶ 4; D. Mem. 6.) HCC Global Financial Products LLC, Houston's agent, has its principal place of business in Farmington, Connecticut, and also conducts business in New York. (Answer ¶ 5; Compl. ¶ 5; P. Reply Mem. 8.)

■ As "the law of the place which has the most significant contacts with the matter in dispute," *Maryland Cas.*, 332 F.3d at 151 (citing *Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99 (1954) (internal quotation marks omitted)), Maryland law governs this dispute. In addition to the aforementioned Maryland contacts—primary place of insured risk; plaintiffs' principal place of business; the Policy's place of delivery—the underlying lawsuit for which plaintiffs seek coverage was filed in Maryland state court, and plaintiffs were all employed by Sloan's in Maryland. That the Policy was issued in Connecticut by Houston's Connecticut agent or that the insurer is located in Texas is insufficient to justify application of either Texas's or Connecticut's laws, *see, e.g., Wiener*, 2002 WL 31108182, at *2; *Munzer v. St. Paul Fire & Marine Ins. Co.*, 203 A.D.2d 770,

610 N.Y.S.2d 389, 390–91 (2d Dept.1994); indeed, defendant does not argue that Texas or Connecticut law should apply. Not only are the primarily important contacts to Maryland, but the New York contacts— Houston is licensed to do business in New York, Seidel and Sassoon are New York citizens,[14] some of plaintiffs' counsel practice in New York—are relatively less significant to the insurance contract dispute at hand.[15]

### III. *Insurance Coverage*

#### A. Maryland Law on Interpretation of Insurance Contracts

■ In Maryland, courts attempt to effectuate the intent of the parties as derived from the plain meaning of the policy's terms. *Sallie v. Tax Sale Investors, Inc.*, 149 Md.App. 141, 814 A.2d 572, 577–78 (2002). In *Pacific Indemnity Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 488 A.2d 486, 488–489 (1985), Maryland's highest court summarized Maryland law as to interpretation of insurance contracts:

> An insurance contract, like any other contract, is measured by its terms.... To determine the intention of the parties to the insurance contract, which is the point of the whole analysis, we construe the instrument as a whole. Maryland courts should examine the character of

14. Berringer is a citizen of Maryland, Seidel and Sassoon citizens of New York. But directors' and officers' residences are not dispositive or even weighty considerations when determining which state's law to apply in an insurance contract, since the directors and officers are not parties to but third-party beneficiaries of such policies. Moreover, consideration for each director's and officer's residence would create chaos as to choice-of-law determinations in such disputes. *See Am. Int'l Specialty*, 1997 WL 906427, at *5–6. Contrary to defendant's assertion (D.Mem.6), the risk under this Policy does not travel with

the domicile of the officers and directors, but rather is limited to their management decisions at Sloan's, located in Maryland.

15. As defendant points out (D.Mem.6), plaintiffs do not know the location of the broker or agency placing the Policy or where the premiums were paid. However, even assuming, arguendo, that these factors pointed to New York, they would not tip the balance; even then, Maryland would have the most significant contacts to this dispute.

the contract, its purpose, and the facts and circumstances of the parties at the time of execution. In so doing, we accord words their ordinary and accepted meanings. The test is what meaning a reasonably prudent layperson would attach to the term.

The Court must first confine its inquiry to the contractual language alone. *Id* at 489. If a contract is unambiguous, this Court may construe it as a matter of law. *Id.; Callaway v. MAMSI Life & Health Ins. Co.*, 145 Md.App. 567, 806 A.2d 274, 282 (Md.2002). Contractual language "may be ambiguous if it is 'general' and may suggest two meanings *to a reasonably prudent layperson.*" *Pac. Indem. Co.*, 488 A.2d at 489 (emphasis added); *Callaway*, 806 A.2d at 282. If the policy's terms are ambiguous, this Court must look to extrinsic evidence to ascertain the parties' intent. *Beale v. Am. Nat'l Lawyers Ins. Reciprocal*, 379 Md. 643, 843 A.2d 78, 87–88 (2004). Although "Maryland does not follow the rule . . . that an insurance policy is to be construed most strongly against the insurer . . . if no extrinsic or parol evidence is introduced, or if the ambiguity remains after consideration of the extrinsic or parol evidence that is introduced, it will be construed against the insurer as the drafter of the instrument." *Id.* (internal quotation marks and citations omitted) (collecting cases).

### B. Policy Coverage

■ As there is no dispute that plaintiffs are insured persons under the Policy, nor is there any dispute that Martin's action constitutes a claim under the Policy or that the Policy covers losses in the form of defense costs, the threshold question is whether the Policy's coverage extends to risk that encompasses Martin's lawsuit against plaintiffs. To resolve this question on a summary judgment motion, the Policy must unambiguously cover plaintiffs' claim. *See Pac. Indem. Co.*, 488 A.2d at 489.

■ Plaintiffs argue that Martin "sued them for their management actions of using funds for corporate operational expenses rather than to pay consignors, [and therefore] the Management Carveback clearly applie[s] to [plaintiffs] and require[s] Houston to pay their defense costs." (P. Mem.7.) Contrariwise, defendant argues that the Management Carveback does not cover plaintiffs' defense costs because Martin's suit "ar[o]se out of the transaction with Martin, and not in connection with Plaintiffs' management or supervision of any division, subsidiary or group with Sloan's." (D.Mem.9.) [16]

---

16. In its reply memorandum, defendant argues that because the Management Carveback revives coverage of claims alleging wrongful acts by insured persons "in connection with the management" of a division or group of Sloan's, "as is widely accepted in the industry, only shareholder claims were intended to be revived, not client claims, as only shareholders have legal standing to seek redress for mismanagement." (D. Reply Mem. 4.) But, as plaintiffs point out, "[n]either the Management Carveback nor anything else in the policy says anything about limiting D & O coverage to claims by stockholders." (Letter from Sheldon H. Elsen to the Court, dated September 7, 2004, at 1.) This Court's "inquiry is confined to analysis of the language used" from the point of view of a "reasonably prudent layperson," *Pac. Indem. Co.*, 488 A.2d at 488–89, and thus, the Policy's plain language, not industry expertise, is decisive. Although industry standards may be an acceptable form of evidence when interpreting ambiguous insurance contracts, this Policy is unambiguous with regards to its coverage of plaintiffs' claims. *See id.* at 489 ("trade usage" may be consulted to construe ambiguous language in insurance contract). Defendant's only previous mention of this argument is in a vague affirmative defenses asserted in its answer. Since "[c]onstruction of the contract by the parties to it before the controversy arises is an important aid to interpretation of uncertain terms," *id.*, that defendant raised the shareholder reading of the Carveback so late in this

The primary coverage provision of the Policy covers "Loss" in the form of "Defense Costs" as a result of "any civil proceeding" for a "Wrongful Act" by the insured person in his capacity as a director or officer. Although the primary coverage terms of the policy plainly provide coverage for plaintiffs' claims, the Errors and Omissions Exclusion, on its own, seems to exclude claims like those of plaintiffs: "[n]o coverage will be available under this Policy for Loss, including Defense Costs, from Claims for any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or actual or alleged failure to render, any services for others for a fee or commission or on any other compensated basis by any person or entity otherwise entitled to coverage under this policy." But the Errors and Omissions Exclusion in turn includes the Management Carveback, clarifying that the exclusion "is not intended, however, nor shall it be construed, to apply to Loss, including Defense Costs, in connection with any claim against an Insured Person who is a director of officer ... to the extent that such Claim is for a Wrongful Act by such Insured Person ... in connection with the management or supervision of any division. Subsidiary, or group of the Insured Organization offering any of the aforementioned services."

The heart of this conflict rests in the proper reading of the Management Carveback. Looking to the Carveback from a reasonably prudent layperson's perspective, as this Court must pursuant to Maryland law, *Callaway*, 806 A.2d at 282, the Policy unambiguously covers plaintiffs' defense costs for Martin's lawsuit, which sued plaintiffs, high-level officers, for their management of Sloan's—specifically, for their decision, in a period of fiscal difficulty for Sloan's, to use available funds for corporate operational expenses rather than to pay consignors like Martin.

Defendant elevates form over substance with its argument that plaintiffs were sued "in connection with the transaction with Mr. Martin," and not for management decisions at Sloan's. That the root of Martin's dispute with Sloan's was its auction contract with him does not alter the fact that Martin's suit directly challenged plaintiffs' management of Sloan's. Martin's suit alleged not merely that Sloan's did not pay him what he was owed. Indeed, such a breach of contract claim would presumably lie only against Sloan's, the entity with whom Martin contracted, and not against individual members of its senior management personally. Rather, Martin alleged that the plaintiffs had conducted the firm as a racketeering enterprise by utilizing the funds of hundreds of customers to pay the firm's expenses when the company was in dire straits, rather than attending first to the firm's legitimate debts to its customers. Martin's complaint does not allege that plaintiffs had any personal involvement in any decision relating to serving Martin,[17] but rather charges these high-level officers with mismanaging

---

litigation, and failed to ever raise it in its conversations with plaintiffs, further discounts this reading of the Policy. Moreover, defendant's suggestion that "to read the Policy as plaintiffs urge would be in direct contradiction of the Policy's intended purpose, as commonly understood in the industry" is equally inapposite for its insistence on an insider's reading of the contract. (D. Reply Mem. 5.)

**17.** At most, Martin's complaint vaguely alleges that plaintiffs "knew that the consignors were not being timely paid the net proceeds of auction sales" at the time that Sloan's employees represented to him that he would be paid within thirty-five business days of the auction. (Martin Third Am. Compl. ¶¶ 85–86.) But like Martin's other allegations, this allegation is not specific to Martin, and suggests only that plaintiffs were making certain

the company in a way that harmed Martin's interests. The only actions of plaintiffs that Martin's suit questioned were plaintiffs' big-picture financial decisions about managing the company, which Martin alleged were wrongful and had the effect of denying payment to customers. Martin's suit clearly constitutes a "Claim ... for a Wrongful Act by such Insured Person ... in connection with the management or supervision of any division, Subsidiary, or group of [Sloan's]."

The Policy's plain language contradicts defendant's assertion that the Policy was intended to exclude customer suits altogether. That could be a plausible reading of the Policy as a whole *without the Management Carveback*. Indeed, the Carveback is necessary precisely because *some* customer claims are intended to be covered, specifically, those claims that relate to management decisionmaking. The Management Carveback unambiguously limits the Exclusion so as to cover claims that, *notwithstanding that they involve errors and omissions in connection with the rendering of services to customers*, can properly be characterized as claims of wrongful acts in connection with the management and supervision of the firm. In other words, by its own terms, the Management Carveback does not simply provide coverage for management decisions as

distinguished from customer service claims; rather, as a "carveback" or exception to the customer service exclusion, it provides coverage for those management decisions that would otherwise arguably be within the exclusion for errors or omissions in connection with rendering services to clients. The Martin lawsuit involves precisely this kind of claim: though it does concern Sloan's alleged failure to render services to customers, and therefore arguably falls within the Exclusion, it is a claim not for a simple breach of a customer contract, but rather for an alleged "Wrongful Act ... in connection with the management or supervision" of a division of Sloan's that provides such services, and thus falls within the Carveback. Unlike a claim against an auctioneer for providing shoddy service, Martin's claims against plaintiffs were directed at the highest level of the firm's management, and charged them with managing the company in a way that led not merely to a dereliction of service in a particular case, but to systematic malfeasance by the company.

 Thus, the Policy unambiguously covers plaintiffs' claims for coverage in relation to the Martin suit.[18]

### C. Houston's Other Defenses

 Defendant suggests that it did not consent to plaintiffs' fees in defending the

---

large-scale management decisions with regards to whether to continue to execute contracts with new customers, despite their knowledge that they were not paying other consignors on time.

18. Defendant's reliance on its underwriting manager to the contrary is to no avail. JoAnn Leifert, an Underwriting Manager at Houston, submitted a declaration in support of Houston's motion, which appears to be an effort to contrast D & O insurance with Errors and Omissions insurance in such a way as to suggest that the D & O insurance Sloan's purchased clearly does not cover plaintiffs' defense costs. (JoAnn Leifert Decl. ¶¶ 8–9, D.

Opp'n Ex. D.) Leifert argues that if Houston had "been aware" that Sloan's "ever harbored the intention to make claims against the Policy" for suits such as Martin's, Houston would have either charged a higher premium for the Policy, or not issued it at all. (*Id.* ¶ 10.) Under Maryland law, this expert opinion does not create confusion in what is otherwise clear contractual language. *Callaway*, 806 A.2d at 282. Moreover, "[t]he test to determine ambiguity is not what the insurer intended its words to mean.... The criterion is ambiguity from the standpoint of a layman...." *Id.* (internal quotation marks and citations omitted, ellipses in original).

Martin suit and that the fees are unreasonable. (D.Mem.14–15, 17) With regards to consent, defendant does not point to any evidence that it withheld consent to plaintiffs' representation. To the contrary, as plaintiffs point out, there is substantial evidence in the record—an e-mail from Houston confirming its approval of particular lawyers to represent Seidel; MacLelland's request of plaintiffs for billing rates and a tentative budget; plaintiffs' response to that request; defendant's actual payment of the portion of the fees incurred by plaintiffs; and a letter suggesting previous discussions regarding settlement of the Martin suit—that clearly indicates that defendant had in fact consented to plaintiffs' retention of counsel, and was aware of, and did not object to their fees. (P. Reply Mem. 5; E-mail from MacLelland to Griffin, dated June 24, 2003; Letter from Griffin to MacLelland, dated May 7, 2003; Letter from Orans, Elsen & Lupert LLP to MacLelland, dated June 27, 2003; Letter from Elsen to MacLelland, dated April 5, 2004, at 1–2.) Aside from defendant's conclusory assertions, there is no evidence whatsoever that defendant was not aware of, or did not consent to, plaintiffs' attorneys and their fees. After confirming without objecting to plaintiffs' retention of counsel, apparently discussing legal strategy with them, and then disclaiming coverage, Houston cannot now argue that plaintiffs' counsel's fees are unreasonable.

In its reply brief, Houston argues that if liable for attorneys' fees, "the Policy requires that any loss still must be allocated between the covered and non-covered claims." (D. Reply Mem. 9.) Houston's argument that the Court must allocate costs between covered and non-covered claims is moot, however, as all of Martin's claims against plaintiffs were in connection with plaintiffs' management of Sloan's.

Finally, defendant raises various affirmative defenses in its answer,[19] some of which constitute arguments about how to interpret the Policy, and the remainder of which have either no apparent relevance to this case, or no merit. To the extent that defendants pose meritorious arguments through these defenses, they were also posed and developed in this motion, and the Court has addressed them. As to the remaining defenses, Houston spends little more than one page summarily defending them, and does not seriously attempt to seek or resist summary judgment on grounds related to them. Those defenses that are not already addressed by the Court have thus been effectively abandoned.

## IV. *Legal Fees for this Lawsuit*

As defendant concedes (D.Mem.17), Maryland recognizes an exception to the American rule that "generally requires that each party be responsible for [its] own counsel fees." *Megonnell v. United Servs. Ass'n,* 368 Md. 633, 796 A.2d 758, 774 (2002). Under Maryland law, "when an insured must resort to litigation to enforce its liability insurer's contractual duty to provide coverage for its potential liability to injured third persons, the insured is entitled to a recovery of the attorneys' fees and expenses incurred in that litigation," *see Nolt,* 617 A.2d at 584, regardless of whether the policy at issue involves a duty to defend or a duty to pay for a loss.

19. The answer includes the following defenses: failure to state a claim; general denial; standing; policy terms, conditions, limitations and exclusions; failure to satisfy policy; failure to cooperate/collusion; failure to consult/lack of consent; errors and omissions exclusions; reasonable defense costs; consent to defense costs; limits of liability; no coverage for certain claims; failure to mitigate; non-insured persons; unclean hands; accord and satisfaction; release; reservation of rights.

*Continental Cas.*, 489 A.2d at 547. Here, plaintiffs did just that—plaintiffs resorted to litigation to enforce defendant Houston to cover its potential liability to a third-party.

Defendant argues that plaintiffs are still not entitled to recover attorneys' fees, however, because "there has been no ... determination" that there is coverage under the policy and "[p]laintiffs' demand is premature." (D.Mem.17.) But as the Court has just decided that plaintiffs are entitled to coverage for their claims, plaintiffs' demand is perfectly appropriate. *See Bausch & Lomb Inc. v. Utica Mutual Ins. Co.*, 355 Md. 566, 735 A.2d 1081, 1094 (1999) ("Where an action is brought to enforce an insurer's obligations ... and it is determined that there is coverage under the policy, the insurer is liable for the prevailing party's attorneys' fees.") Thus, under Maryland law, plaintiffs are entitled to recovery of attorneys' fees and expenses incurred in this litigation.

## V. *Declaratory Relief*

Plaintiffs request declaratory relief under the Declaratory Judgment Act, which empowers this Court "[i]n a case of actual controversy within its jurisdiction ... upon the filling of an appropriate pleading, [to] declare the rights and the legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). "The party invoking the jurisdiction of the court must show that he is immediately in danger of sustaining some direct injury which is not conjectural or speculative." *Wedtech Corp. v. Fed. Ins. Co.*, 740 F.Supp. 214, 220 (S.D.N.Y. 1990) (internal citations and quotation marks omitted). This case presents a classic controversy ripe for declaratory relief. "Disputes over coverage afforded by an insurance policy present an actual case or controversy, so that declaratory judgment is appropriate." *Morris v. Progressive Cas. Ins. Co.*, 662 F.Supp. 1489, 1491 (S.D.N.Y.1987). Plaintiffs have already incurred substantial fees in defense of the Martin lawsuit, and defendant has not only disclaimed coverage, but has demanded repayment of fees it has "mistakenly" reimbursed. Under the circumstances, any contention that the controversy is not ripe for decision is frivolous.

## CONCLUSION

For the reasons stated, plaintiffs' motion for summary judgment is granted, and defendants' cross-motion is denied.

SO ORDERED.